## NEWBERRY ET AL. *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 559. Argued January 7, 10, 1921.—Decided May 2, 1921.

1. Section 8 of the "Federal Corrupt Practices Act " (June 25, 1910, c. 392, 36 Stat. 822; amended August 19, 1911, c. 33, 37 Stat. 25), which undertakes to limit the amount of money which any candidate for the office of Representative in Congress or of United States Senator shall give, contribute, expend, use, or promise, or cause to be given, contributed, expended, used, or promised, in procuring his nomination or election, is unconstitutional. So *held*, as applied to a primary election of candidates for a seat in the Senate. P. 247.

2. The power of Congress over elections of Senators and Representatives has its source in § 4 of Art. I of the Constitution, which provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of chusing Senators." P. 247.

3. An indefinite, undefined power in Congress over elections of Senators and Representatives, not derived from Art. I, § 4, cannot be inferred from the fact that the offices were created by the Constitution, or by assuming that the Government must be free from any control by the States over matters affecting the choice of its officers,—a false assumption, ignoring powers clearly vested in the States under the Constitution and the federal character of the Government. P. 249.

4. Elections, within the original intendment of § 4 of Art. I, were those wherein Senators should be chosen by legislatures and Representatives by voters possessing "the qualifications requisite for electors of the most numerous branch of the State Legislature." Art. I, §§ 2 and 3. P. 250.

5. The Seventeenth Amendment neither announced nor requires a new meaning of election, and the word now has the same general significance as it did when the Constitution came into existence,—final choice of an officer by the duly qualified electors. P. 250.

6. Primaries are in no sense elections for office, but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors. P. 250.

7. The Seventeenth Amendment does not modify Art. I, § 4, the source of congressional power to regulate the times, places and manner of holding elections; that section remains intact and applicable to the election of both Representatives and Senators. P. 252.

8. The Act of June 4, 1914, c. 103, 38 Stat. 384, providing a temporary method of conducting the nomination and election of Senators, sheds no light on the power of Congress to regulate primaries and conventions. P. 253.

9. Even if the Seventeenth Amendment gave power to regulate primaries for the choice of senatorial candidates, its adoption did not validate the earlier penal statute on the subject (Act of 1910–1911, *supra*, par. 1); an after-acquired power cannot *ex proprio vigore* validate a statute void when enacted. P. 254.

10. Section 2 of the Act of June 4, 1914, *supra*, if it could be regarded as an attempt to regulate nominations of Senators, based on the Amendment, would have no bearing on a prosecution under the Act of 1910–1911, for conduct occurring after that section expired by its own limitation. P. 254.

11. The power to control party primaries for designating candidates for the Senate is not within the grant of power "to regulate the manner of holding elections" (Art. I, § 4),—neither within the

fair intendment of the words used nor the meaning ascribed to them by the framers of the Constitution; it is not necessary in order to effectuate the power expressly granted (Art. I, § 8, cl. 18); and its exercise would interfere with purely domestic affairs of the States and infringe upon liberties reserved to the people. P. 256.
Reversed.

WRIT of error to a conviction and sentence under an indictment charging conspiracy to violate the Federal Corrupt Practices Act. The case is stated in the opinion, post, 243.

Mr. Charles E. Hughes, with whom Mr. James O. Murfin, Mr. Martin W. Littleton and Mr. George E. Nichols were on the briefs, for plaintiffs in error:

The statutory provision in question is without constitutional authority. Article I, § 4, of the Constitution, is the only provision of the Constitution which can be invoked in the attempt to find authority for the legislation upon which this prosecution is based. United States v. Gradwell, 243 U. S. 476, 481, 482. The power thus conferred upon Congress is a limited one, confined to regulations of "the times, places and manner of holding elections."

The qualifications of electors, and of those who might be elected, are defined in other provisions. It is apparent that while Congress should have the power to regulate the times, places and manner of holding elections, it was not intended otherwise to detract from the freedom of the people of the States with respect to their political activities. The conditions with respect to suffrage in the several States, at the time of the adoption of the Constitution, are stated in Minor v. Happersett, 21 Wall. 162, 172. Each State had determined for itself who should have the right to vote, and, in creating the new government, it was provided, with respect to the choice of members of the House, that "the electors in each State shall have the qualifications requisite for electors

of the most numerous branch of the state legislature "
(Art. I, § 2); and with respect to the Senators that they
should be "chosen by the legislature " of each State
(Art. I, § 3). And when the Seventeenth Amendment
was adopted, a provision was made with respect to the
qualifications of electors similar to that which obtains
in the case of electors of the members of the House.

With these provisions as to qualifications of electors,
the measure of control given to Congress was the control
of "the times, places and manner of holding elections "
with the exception as to "the places of chusing Senators."
As to the Senate, the extent of the power was to regulate
the "*time* " and "*manner.*" The Federalist, No. LX.
See, also, Farrand, Records of Federal Convention, vol. 3,
pp. 194, 195, 267, 311, 319, 344, 345, 359.

The sole question then is whether the statute is a
regulation of the "manner of holding elections."

The "*election* " is the choice of the Senator or Repre-
sentative, and the "*holding* " of the election is the taking
of the vote to determine the choice. The regulation of
the "*manner* " of holding elections is manifestly the
regulation of the way in which the vote to determine
the choice shall be taken and registered.

As Congress has the power to regulate the taking of
the vote, Congress has the power to protect the qualified
voters in exercising their right to vote at the time when
the vote is taken. Congress also has the power to super-
vise the taking of the vote in order to make sure that the
vote is duly taken, and Congress may also prescribe how
the vote shall be counted and the result registered. In
this power to regulate there would be involved the power
to protect the voter in the casting of his vote, to protect
the evidence of the vote, to insure freedom from any
improper tampering with the vote or with the counting
of the vote or with the registration of its result.

Congress is thus authorized to surround the election.

that is, the taking of the vote, with appropriate safeguards and with such adequate supervision as will insure to the voter the free exercise of his right and establish the choice as shown by the vote properly taken and counted. *Ex parte Siebold,* 100 U. S. 371, 396; *Ex parte Yarbrough,* 110 U. S. 651, 661; *United States* v. *Mosley,* 238 U. S. 383; *In re Coy,* 127 U. S. 731, 752.

The history of the action of Congress under the authority conferred by Art. I, § 4, reviewed by Mr. Justice Clarke in *United States* v. *Gradwell, supra,* 482–484, is most instructive. A distinction is at once apparent between the regulation of the manner of holding elections, in order to protect the rights of the voter and to secure a fair count, and the attempt to interfere with or control the activities of the people of the States in the conduct of political campaigns. In other words, if we assume the validity of regulations which protect each qualified voter in the exercise of his right to vote and which provide for the supervision of the casting of the vote and the proper ascertainment of the result, then the question is whether Congress can go further and attempt to control the educational campaign. Upon what ground can it be said that Congress can provide how many meetings shall be held, where meetings shall be held, how many speakers shall be allowed to speak for a candidate, how many circulars may be distributed, how many committees may act in behalf of a candidate, how they shall be organized and what shall be the limit of their honest activity?

In the exercise of the power conferred, prior to the legislation now under consideration, Congress always dealt with the election and the conduct of the election, and never with the nominating process.

If it be said that it was not the intention of Congress by this legislation to regulate the "election," but to impose a restriction upon the candidate as an individual, the act nevertheless would be invalid.

The so-called "nominating primary " was unknown at the time of the adoption of the Constitution; it is a development of comparatively recent years. The nominating primary, like the nominating convention and its predecessor, the caucus, is not the "election." The nominating process is distinct from the election, and it was so regarded at the time of the adoption of the Constitution.

What the term "elections " meant at the time of the adoption of the Constitution, it means now. See *Hawke* v. *Smith*, 253 U. S. 221, 227, 228, involving the meaning of the word "legislatures," as used in Article V with respect to the ratification of amendments. The ruling in that case is not at all at variance with the familiar decisions that when a constitutional provision embodies a certain concept, whatever is properly within the concept is embraced within the words of the Constitution, although it lay far beyond the vision of the framers of the Constitution. *In re Debs*, 158 U. S. 564, 591; *Hammer* v. *Dagenhart*, 247 U. S. 251.

No one would have the hardihood to suggest that within the meaning of the framers of the Constitution the word "elections " had reference to anything else than the taking of the vote for Senators or Representatives.

At the time of the adoption of the Constitution, the nomination process was a very simple one. No one could have confused it with an "election." Nominations were early made at the caucus, which was either an informal gathering of the voters of a particular district or a "legislative" or "congressional" caucus. It was not regulated by law and no one regarded it as an "election." Later, the caucus gave way to the nominating convention to which delegates were chosen. But no one supposed that the nominating convention was an "election." It is only recently that nominating conventions have been subject to legal regulation in the States. The introduction of the so-called primary system was simply

another phase of the nominating process. The primary was no more an "*election*," within the meaning of the Constitution, than the nominating convention or the caucus was an "election." It is a mere accidental circumstance that because of the method adopted in the primary there has come into use the expression "primary election." The present use of this term has nothing to do with the meaning of "elections" as used in Art. I, § 4.

In providing that Congress might substitute its regulation for that of the States with reference to the "election" the framers of the Constitution had reference to a very distinct subject of regulation, to-wit, the "election" itself. There had been no attempt to regulate by law the nominating process. There was nothing at the time of the adoption of the Constitution, or for approximately a hundred years after, which savored of an attempt to regulate the political activities of citizens so far as these related to nominations.

It follows then that the Constitution used a term with a well-defined meaning. There is nothing in the knowledge, spirit or conditions of the times which suggests any purpose to widen that term so to embrace that which according to its natural significance it did not embrace. It is inconceivable that, had there been any intention to delegate power to regulate the process of nominations, the framers of the Constitution would have been content to provide for the regulation of the "times, places and manner of holding elections."

We think there is far more to be said for the proposition that the word "legislatures" in Art. V referred to those who legislated whether a representative body or the people themselves than to say that the word "*elections*" in Art. I, § 4, embraces the nominating process.

Even under state constitutions the term "elections" does not embrace so-called "primary elections" when the term refers to the election of public officers.

*State* v. *Erickson,* 119 Minnesota, 152, 156; *State* v. *Taylor,* 220 Missouri, 618, 631; *Zent* v. *Nichols,* 50 Washington, 508, 522; *Ledgerwood* v. *Pitts,* 122 Tennessee, 570, 587; *State* v. *Woodruff,* 68 N. J. L. 89, 94; *Commonwealth* v. *Wells,* 110 Pa. St. 463, 468; *People* v. *Cavanaugh,* 112 California, 674, 676, 677, and other cases, including *United States* v. *O'Toole,* 236 Fed. Rep. 993, 996 (heard with *United States* v. *Gradwell,* 243 U. S. 476, and affirmed).

We find in Art. I, § 6, subdiv. 2, the provision that "No Senator or Representative shall, during the time for which he was *elected,* be appointed to any civil office under the authority of the United States," etc. It is obvious that the word *"elected"* does not mean "nominated." And the Senator or Representative is elected at the *"election"* and not before.

The "elections" of Representatives to which Art. I, § 4, refers, and the manner of holding which may be regulated by Congress, are the "elections" at which the "electors," to whom reference is made in Art. I, § 2, vote. It is because they vote at the "elections" for members of the House that they are called "electors." But the term "electors" like the term "elections" has no reference to a nominating primary. If Congress has the power to regulate a nominating primary, it has also the power to regulate a nominating convention and the vote of delegates at a nominating convention.

We venture to say that there is not a word in the Constitution, or in any contemporary document, which can be tortured into a support of the view that *"elections"* in Art. I, § 4, comprehends any nominating system.

The meaning of the word "elections" is not extended by the expression *"manner of holding"* elections, for the manner of holding the election is necessarily limited to the election which is held.

If Congress under Art. I, § 4, has the power which

it has sought to exercise in the statute in question, it has the power to *abolish all primary elections* for Senators and Representatives in every State of the Union. It has the power to establish conventions, to overthrow conventions, to provide any sort of a primary that it may desire to provide. Such interferences with the rights and privileges of the citizens of the several States have no warrant in the Constitution.

*The Solicitor General* and *Mr. Frank C. Dailey*, Special Assistant to the Attorney General, for the United States:

A Senator being an officer of the United States holding an office created by the Constitution and constituting a part of the Federal Government, all matters relating to his election belong to the Government of the United States, which has the same power over them that the States have over matters relating to the election of state officers, unless restricted by the Constitution itself.

It is assumed in the argument in behalf of the plaintiffs in error that the only power which Congress has over the election of Senators and Representatives is derived from Art. I, § 4, of the Constitution, relating to the times, places, and manner of holding such elections. This is by no means true. That section, on the contrary, contains only a grant of power to the States to be exercised subject to the control of Congress, in the exercise of a power which would be its, even if this section were not in the Constitution.

The Government of the United States is not a confederation of States. It is a government ordained by the people of the United States and, within the sphere of its powers, wholly independent of the state governments. A Senator or a Representative in Congress holds an office which was created by the Constitution. He is chosen not by the States but by that portion of the people of the United States who reside in the State in which he

is elected. He is an officer. not of any State but of the Federal Government. *Lamar* v. *United States,* 241 U. S. 103, 112. Unless, therefore, the Constitution itself indicates a contrary intention, his election is a matter which concerns only the Federal Government and in no way a state government. It would certainly be an anomaly if one government had the unrestricted power to control matters affecting the choice of the officers of another and entirely independent government. Control of matters relating to the selection of those who are to function as a part of a particular government would seem necessarily to inhere in that government itself. *Ex parte Yarbrough,* 110 U. S. 651, 657.

It is true that the Constitution, fixes the qualification of voters by reference to state laws. This does not mean, however, that the voter derives his right to vote from the State rather than from the Constitution of the United States. *Ex parte Yarbrough,* supra, 663. ·

Whatever power the States have over matters relating to the election of federal officers is not one of their reserved powers but a power expressly conferred by the Constitution.

The only power conferred on the States by the Constitution over matters relating to the election of Senators and Representatives is expressly made subordinate to the power of Congress over the same matter. Const., Art. I, § 4; Seventeenth Amdt. In effect, what was done by § 4 was to provide that the first Congress should be elected through the use of the election machinery of the various States, and that this method of electing congressmen should continue, except as Congress might, from time to time, see fit to alter it or to supplant it with election machinery of its own. If, therefore, the power to make regulations relating to primary elections is included in the power to prescribe the manner of holding elections, the exercise of this power is subject to the

control of Congress. Whatever power the States may exert over congressional or senatorial primaries, in the absence of action by Congress, may be exerted under the express provision of § 4 by Congress whenever deemed necessary.

If Congress has no power to make regulations of the kind now involved, neither have States, and there is no power anywhere which can control and prevent excessive expenditures by candidates for senatorial or congressional nominations. And yet, practically, and to all intents and purposes in many States, the most important and decisive act in the choosing of officers is the nomination.

The States undoubtedly have the power to regulate primary elections for the selection of candidates for state offices, because such regulations are necessary to protect the integrity of elections themselves. For the same reason Congress has the power to regulate primary elections for choosing candidates for federal offices.

Ample authority to sustain this legislation is found in Art. I, § 4, of the Constitution, even if the necessary power must be derived from that section; and, even if the word "elections" as there used is not construed as including primary elections, the law is still constitutional. This section must be read in connection with the last clause of Art. I, § 8, which confers upon Congress the power to make all laws which shall be necessary and proper for carrying into execution the powers expressly granted. *Ex parte Siebold*, 100 U. S. 371, 396; *Ex parte Yarbrough*, 110 U. S. 651, 658; *United States* v. *Gradwell*, 243 U. S. 476, 482.

Manifestly, this provision of the Constitution grew out of the conviction that it would be suicidal for the new government to commit to any other government a controlling power over the choosing of its officers without reserving to itself a supervisory power. For a State to

arrange its election laws by providing for two elections, the first for the purpose of reducing the number of candidates and the second for the purpose of choosing between the surviving candidates, is, in many States, for all practicable purposes, equivalent to choosing the officials in the first or primary elections.

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

Plaintiffs in error—Truman H. Newberry, Paul H. King and fifteen others—were found guilty of conspiring (Criminal Code, § 37) to violate § 8, Act of Congress approved June 25, 1910, c. 392, 36 Stat. 822–824, as amended by Act of August 19, 1911, c. 33, 37 Stat. 25–29,— The Federal Corrupt Practices Act—which provides: "No candidate for Representative in Congress or for Senator of the United States shall give, contribute, expend, use, or promise, or cause to be given, contributed, expended, used, or promised, in procuring his nomination and election, any sum, in the aggregate, in excess of the amount which he may lawfully give, contribute, expend, or promise under the laws of the State in which he resides: *Provided*, That no candidate for Representative in Congress shall give, contribute, expend, use, or promise any sum, in the aggregate, exceeding five thousand dollars in any campaign for his nomination and election; and no candidate for Senator of the United States shall give, contribute, expend, use, or promise any sum, in the aggregate, exceeding ten thousand dollars in any campaign for his nomination and election: *Provided further*, That money expended by any such candidate to meet and discharge any assessment, fee, or charge made or levied upon candidates by the laws of the State in which he resides, or for his necessary personal expenses, incurred for himself alone, for travel and subsistence, stationery

and postage, writing or printing (other than in news-papers), and distributing letters, circulars, and posters, and for telegraph and telephone service, shall not be regarded as an expenditure within the meaning of this section, and shall not be considered any part of the sum herein fixed as the limit of expense and need not be shown in the statements herein required to be filed."

Act No. 109, § 1, Michigan Legislature, 1913, prohibits expenditure by or on behalf of a candidate, to be paid by him, in securing his nomination, of any sum exceeding twenty-five per centum of one year's compensation; and puts like limitation upon expenditures to obtain election after nomination. Section 1 is copied below.[1]

Taken with the state enactment, the federal statute in effect declares a candidate for the United States Senate punishable by fine and imprisonment, if (except for cer-

---

[1] Act No. 109, Michigan Legislature, 1913:

"Section 1. No sums of money shall be paid, and no expenses authorized or incurred by or on behalf of any candidate to be paid by him in order to secure or aid in securing his nomination to any public office or position in this State, in excess of twenty-five per cent of one year's compensation or salary of the office for which he is candidate: *Provided*, That a sum not exceeding fifty per cent of one year's salary may be expended by the candidates for Governor and Lieutenant Governor; or where the office is that of member of either branch of the Legislature of the State, the twenty-five per cent shall be computed on the salary fixed for the term of two years: *Provided further*, That no candidate shall be restricted to less than one hundred dollars in his campaign for such nomination. No sums of money shall be paid and no expense authorized or incurred by or on behalf of any candidate who has received the nomination to any public office or position in this State, in excess of twenty-five per cent of one year's salary or compensation of the office for which he is nominated; or where the office is that of member of either branch of the Legislature of the State, the twenty-five per cent shall be computed on the salary fixed for the term of two years: *Provided*, That no candidate shall be restricted to less than one hundred dollars. No sum of money shall be paid and no expenses authorized or incurred by or on behalf of any candidate contrary to the provisions of this act."

tain specified purposes) he give, contribute, expend, use, promise or cause to be given, contributed, expended, used or promised in procuring his nomination and election more than $3,750.00—one-half of one year's salary. Under the construction of the act urged by the Government and adopted by the court below it is not necessary that the inhibited sum be paid, promised or expended by the candidate himself, or be devoted to any secret or immoral purpose. For example, its open and avowed contribution and use by supporters upon suggestion by him or with his approval and coöperation in order to promote public discussion and debate touching vital questions or to pay necessary expenses of speakers, etc., is enough. And upon such interpretation the conviction below was asked and obtained.

The indictment charges: That Truman H. Newberry became a candidate for the Republican nomination for United States Senator from Michigan at the primary election held August 27, 1918; that by reason of selection and nomination therein he became a candidate at the general election, November 5, 1918; that he and 134 others (who are named) at divers times from December 1, 1917, to November 5, 1918, unlawfully and feloniously did conspire, combine, confederate, and agree together to commit the offense on his part of wilfully violating the Act of Congress approved June 25, 1910, as amended, by giving, contributing, expending, and using and by causing to be given, contributed, expended and used, in procuring his nomination and election at said primary and general elections, a greater sum than the laws of Michigan permitted and above ten thousand dollars, to wit, $100,000.00, and on the part of the other defendants of aiding, counseling, inducing, and procuring Newberry as such candidate to give, contribute, expend, and use or cause to be given, contributed, expended and used said large and excessive sum in order to procure his nomination

and election. Plaintiffs in error were convicted under count one, set out in the margin.[1]

---

(COUNT ONE)

[1] That Truman H. Newberry, Chase S. Osborne, Henry Ford and William B. Simpson, before and on August 27, 1918, were candidates for the Republican nomination for the office of Senator in the Congress of the United States from the State of Michigan at the primary election held in said State on that day under the laws of said State, and Henry Ford and James Helm, before and on said August 27, 1918, were candidates for the Democratic nomination for the same office at said Primary election; that from said August 27, 1918, to and including November 5, 1918, said Truman H. Newberry and said Henry Ford, by reason of their election and nomination at said Primary election, became and were opposing candidates for election to the office of Senator in the Congress of the United States from said State of Michigan at the general election held in said State on said November 5, 1918, —said Truman H. Newberry of the Republican Party and said Henry Ford of the Democratic Party,—each of said candidates having, on said August 27, 1918, and said November 5, 1918, attained to the age of thirty years and upwards and been a citizen of the United States for more than nine years and each then being an inhabitant and resident of said State; and that said Truman H. Newberry, Paul H. King [and 133 others], hereinafter called the defendants, continuously and at all and divers times throughout the period of time from December 1, 1917, to and including said November 5, 1918, at and within said Southern Division of said Western District of Michigan, unlawfully and feloniously did conspire, combine, confederate and agree together, and with divers other persons to said grand jurors unknown, to commit an offense against the United States, to-wit, the offense on the part of said Truman H. Newberry of wilfully violating the Act of Congress approved June 25, 1910, as amended by the Acts of August 19, 1911, and August 23, 1912, by giving, contributing, expending and using and by causing to be given, contributed, expended and used, in procuring his nomination and election as such Senator at said primary and general elections, a sum, in the aggregate, in excess of the amount which he might lawfully give, contribute, expend, or use, or cause to be given, contributed, expended or used for such purpose under the laws of said State of Michigan, to-wit the sum of one hundred thousand dollars, and by giving, contributing, expending and using and causing to be given, contributed, expended and used in procuring his nomination and election as such Senator, at said primary and

The court below overruled a duly interposed demurrer which challenged the constitutionality of § 8; and by so doing we think fell into error.

Manifestly, this section applies not only to final elections for choosing Senators but also to primaries and conventions of political parties for selection of candidates. Michigan and many other States undertake to control these primaries by statutes and give recognition to their results. And the ultimate question for solution here is whether under the grant of power to regulate "the manner of holding elections " Congress may fix the maximum sum which a candidate therein may spend, or advise or cause to be contributed and spent by others to procure his nomination.

Section 4, Art. I, of the Constitution provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each State

general elections, a sum in the aggregate, in excess of ten thousand dollars, to-wit, said sum of one hundred thousand dollars, and on the part of said other defendants of aiding, counseling, inducing and procuring said Truman H. Newberry so to give, contribute, expend and use and cause to be given, contributed, expended and used said large sum of money in excess of the amounts permitted by the laws of the State of Michigan and the said Acts of Congress; the same to be money so unlawfully given, contributed, expended and used by said Truman H. Newberry and by him caused to be given, contributed, expended and used as such candidate for the following and other purposes, objects and things, to-wit:

Advertisements in newspapers and other publications;

Print paper, cuts, plates and other supplies furnished to newspaper publishers;

Subscriptions to newspapers;

Production, distribution and exhibition of moving pictures;

Traveling and subsistence expenses of campaign managers, public speakers, secret propagandists, field, district and county agents and solicitors, and of voters not infirm or disabled

Compensation of campaign managers, public speakers and secret propagandists, and of field, district and county agents and solicitors;

Appropriating and converting to the use of the defendants them-

by the Legislature thereof; but the Congress may at any
time by law make or alter such regulations, except as
to the places of choosing Senators." Here is the source
of congressional power over the elections specified. It
has been so declared by this court—*Ex parte Siebold*,
100 U. S. 371; *United States* v. *Gradwell*, 243 U. S. 476,
481—and the early discussions clearly show that this was
then the accepted opinion. The Federalist, LVIII, LIX,
LX; Elliot's Debates, vol. II, 50, 73, 311; vol. III, 86,
183, 344, 375; vol. IV, 75, 78, 211.

---

selves, and each of them, large sums of money under the guise and pre-
tense of payment of their expenses and compensation for their services;

Rent of offices and public halls;

Bribery of election officials;

Unlawful assistance of election officials;

Bribery of voters;

Expenses and compensation of Democratic obstructionist candidates
at the primary election;

Expenses and compensation of detectives;

Dinners, banquet and other entertainments given to persons be-
lieved to be influential in said State of Michigan;

And no part of which said money was to be money expended by
said Truman H. Newberry, as such candidate, to meet or discharge
assessments, fees, or charges made or levied upon candidates by the
laws of said State, or for his necessary personal expenses, incurred for
himself alone, for travel and subsistence, stationery and postage,
writing or printing (other than in newspapers), or for distributing
letters, circulars, or postage, or for telegraph or telephone service, or
for proper legal expenses in maintaining or contesting the results of
either of said elections.

[38 distinct and separate overt acts are specified].

And so the grand jurors aforesaid, upon their oaths aforesaid, do
say, that said defendants, continuously and at all and divers times
throughout the period of time in this count mentioned, at and within
said division and district, in manner and form in this count aforesaid,
unlawfully and feloniously did conspire to commit an offense against
the United States, and certain of them did do acts to effect the object
of the conspiracy; Against the peace and dignity of the United States,
and contrary to the form of the statute of the same in such case made
and provided.

We find no support in reason or authority for the argument that because the offices were created by the Constitution, Congress has some indefinite, undefined power over elections for Senators and Representatives not derived from § 4. "The government, then, of the United States, can claim no powers which are not granted to it by the Constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 326. Clear constitutional provisions also negative any possible inference of such authority because of the supposed anomaly "if one government had the unrestricted power to control matters affecting the choice of the officers of another." Mr. Iredell (afterwards of this court) in the North Carolina Convention of 1788, pointed out that the States may—must indeed—exert some unrestricted control over the Federal Government. "The very existence of the general government depends on that of the state governments. The state legislatures are to choose the senators. Without a Senate there can be no Congress. The state legislatures are also to direct the manner of choosing the President. Unless, therefore, there are state legislatures to direct that manner, no President can be chosen. The same observation may be made as to the House of Representatives, since, as they are to be chosen by the electors of the most numerous branch of each state legislature, if there are no state legislatures, there are no persons to choose the House of Representatives. Thus it is evident that the very existence of the general government depends on that of the state legislatures." Elliot's Debates, vol. IV, p. 52. See also The Federalist, XLIV. The federal features of our Government are so clear and have been so often declared that no valuable discussion can proceed upon the opposite assumption.

Undoubtedly elections within the original intendment

of §.4 were those wherein Senators should be chosen by Legislatures and Representatives by voters possessing "the qualifications requisite for electors of the most numerous branch of the State Legislature." Art. I, §§ 2 and 3. The Seventeenth Amendment, which directs that Senators be chosen by the people, neither announced nor requires a new meaning of election and the word now has the same general significance as it did when the Constitution came into existence—final choice of an officer by the duly qualified electors. *Hawke* v. *Smith*, 253 U. S. 221. Primaries were then unknown. Moreover, they are in no sense elections for an office, but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors. General provisions touching elections in constitutions or statutes are not necessarily applicable to primaries—the two things are radically different. And this view has been declared by many state courts. *People* v. *Cavanaugh*, 112 California, 674; *State* v. *Erickson*, 119 Minnesota, 152; *State* v. *Taylor*, 220 Missouri, 618; *State* v. *Woodruff*, 68 N. J. L. 89; *Commonwealth* v. *Wells*, 110 Pa. St. 463; *Ledgerwood* v. *Pitts*, 122 Tennessee, 570.

Sundry provisions of the Constitution indicate plainly enough what its framers meant by elections and the "manner of holding" them. "The House of Representatives shall be composed of members chosen every second year by the people of the several States." "No person shall be a Representative. . . who shall not, when elected, be an inhabitant of that State in which he shall be chosen." "When vacancies happen in the representation from any State, the executive authority thereof shall issue writs of election to fill such vacancies." "Immediately after they [the Senators] shall be assembled in consequence of the first election, they shall be divided as equally as may be into three classes." "No person

shall be a Senator . . . who shall not, when elected, be an inhabitant of that State for which he shall be chosen." "Each House shall be the judge of the elections, returns and qualifications of its own members." "No Senator or Representative shall, during the time for which he was elected, be appointed to any civil office," etc. "The executive power shall be vested in a President of the United States of America. He shall hold his office during the term of four years, and, together with the Vice-President, chosen for the same term, be elected as follows." "The President shall, at stated times, receive for his services a compensation, which shall neither be increased nor diminished during the period for which he shall have been elected." And provisions in the Seventeenth Amendment are of like effect.

The plain words of the Seventeenth Amendment and those portions of the original Constitution directly affected by it, should be kept in mind. Art. I, § 3—"The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, for six years; and each Senator shall have one vote. Immediately after they shall be assembled in consequence of the first election, they shall be divided as equally as may be into three classes." "And if vacancies happen by resignation, or otherwise, during the recess of the legislature of any State, the executive thereof may make temporary appointments until the next meeting of the legislature, which shall then fill such vacancies." Seventeenth Amendment—"The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures. When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall

issue writs of election to fill such vacancies: *Provided,*
That the legislature of any State may empower the
executive thereof to make temporary appointment until
the people fill the vacancies by election as the legislature
may direct. This amendment shall not be so construed
as to affect the election or term of any Senator chosen
before it becomes valid as part of the Constitution."

As finally submitted and adopted the Amendment
does not undertake to modify Art. I, § 4, the source of
congressional power to regulate the times, places and
manner of holding elections. That section remains "in-
tact and applicable both to the election of Representatives
and Senators." (Cong. Rec., vol. 46, p. 848.) When
first reported, January 11, 1911, by Senator Borah for
the Judiciary Committee, the proposed Seventeenth
Amendment contained a clause providing, "The times,
places and manner of holding elections for Senators shall
be as prescribed in each state by the legislature thereof "—
the avowed purpose being thereby to modify § 4, Art. I,
by depriving Congress of power to regulate the *manner
of holding elections* for Senators. (A copy of the original
resolution as presented to the Senate is in the margin.)[1]

---

[1] S. J. Res., 134, 61st Congress, Cong. Rec., vol. 46, p. 847.

"Resolved by the Senate and House of Representatives of the
United States of America in Congress assembled (two-thirds of each
House concurring therein), That in lieu of the first paragraph of
section 3 of Article I of the Constitution of the United States, and in
lieu of so much of paragraph 2 of the same section as relates to the
filling of vacancies, and in lieu of all of paragraph 1 of section 4 of
said Article I, in so far as same relates to any authority in Congress
to make or alter regulations as to the times or manner of holding
elections for Senators, the following be proposed as an amendment
to the Constitution, which shall be valid to all intents and purposes
as part of the Constitution when ratified by the legislatures of three-
fourths of the States:

" 'The Senate of the United States shall be composed of two Senators
from each State, elected by the people thereof for six years; and each

Upon recommendation of a minority of the Judiciary Committee this clause was eliminated and reference to § 4, Art. I, omitted from the Resolution. After prolonged debate in the 61st and 62nd Congresses the Amendment in its present form was submitted for ratification. See Sen. Rep. 961, 61st Cong., 3rd sess.; Sen. Rep. 35, 62nd Cong., 1st sess.; Cong. Rec. vol. 46, pp. 847, 851, *et seq.;* vol. 47, *passim,* and pp. 1924, 1925, 1966.

Apparently because deemed unimportant no counsel on either side referred to "An Act Providing a temporary method of conducting the nomination and election of United States Senators," approved June 4, 1914, c. 103, 38 Stat. 384. To show its irrelevancy and prevent misapprehension the act is copied in the margin.[1] Section

---

Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

" 'The times, places, and manner of holding elections for Senators shall be as prescribed in each State by the legislature thereof.

" 'When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election, as the legislature may direct.

" 'This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.' "

[1] Act of June 4, 1914, c. 103, 38 Stat. 384.

"An Act Providing a temporary method of conducting the nomination and election of United States Senators.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That at the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the fourth day of March next thereafter. .

2, which contains the only reference to nomination of candidates for Senator, expired by express limitation June 4, 1917, more than a year prior to the conduct here challenged. The act has no criminal provisions, makes no reference to the earlier statute upon which this prosecution is founded and sheds no light on the power of Congress to regulate primaries and conventions. Its terms indicate intention that the machinery for designating party candidates shall remain under state control. But in no view can an attempt to exercise power be treated as conclusive evidence that Congress possesses such power. Otherwise serious discussion of constitutional limitations must cease. Moreover, the criminal statute now relied upon antedates the Seventeenth Amendment and must be tested by powers possessed at the time of its enactment. An after-acquired power can not *ex proprio vigore* validate a statute void when enacted. See Sutherland Stat. Constr., 2nd ed., vol. I, § 107.

A concession that the Seventeenth Amendment might

---

"Sec. 2. That in any State wherein a United States Senator is hereafter to be elected either at a general election or at any special election called by the executive authority thereof to fill a vacancy, until or unless otherwise specially provided by the legislature thereof, the nomination of candidates for such office not heretofore made shall be made, the election to fill the same conducted, and the result thereof determined, as near as may be in accordance with the laws of such State regulating the nomination of candidates for and election of Members at Large of the National House of Representatives: *Provided,* That in case no provision is made in any State for the nomination or election of Representatives at Large, the procedure shall be in accordance with the laws of such State respecting the ordinary executive and administrative officers thereof who are elected by the vote of the people of the entire State: *And provided further,* That in any case the candidate for Senator receiving the highest number of votes shall be deemed elected.

"Sec. 3. That section two of this Act shall expire by limitation at the end of three years from the date of its approval."

Approved, June 4, 1914.

be applicable in this controversy if assisted by appropriate legislation would be unimportant since there is none. Section 2, Act of June 4, 1914, had expired by express limitation many months before Newberry became a candidate, and counsel very properly disregarded it.

Because deemed appropriate in order effectively to regulate the manner of holding general elections, this court has upheld federal statutes providing for supervisors and prohibiting interference with them, declaring criminal failure by election officers to perform duties imposed by the State, and denouncing conspiracies to prevent voters from freely casting their ballots or having them counted. *Ex parte Siebold*, 100 U. S. 371; *Ex parte Clarke*, 100 U. S. 399; *Ex parte Yarbrough*, 110 U. S. 651; *In re Coy*, 127 U. S. 731; *United States* v. *Mosley*, 238 U. S. 383. These enactments had direct and immediate reference to elections by the people and decisions sustaining them do not control the present controversy. Congress clearly exercised its power to regulate the manner of holding an election when it directed that voting must be by written or printed ballot or voting machines.   c. 154, 30 Stat. 836.

Section 4 was bitterly attacked in the State Conventions of 1787–1789, because of its alleged possible use to create preferred classes and finally to destroy the States.   In defense, the danger incident to absolute control of elections by the States and the express limitations upon the power, were dwelt upon.   Mr. Hamilton asserted: "The truth is that there is no method of securing to the rich the preference apprehended, but by prescribing qualifications of property either for those who may elect, or be elected. But this forms no part of the power to be conferred upon the National Government.   Its authority would be expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections.   The qualifications of the persons who may choose, or be chosen, as has been remarked upon other occasions, are defined and fixed

in the Constitution, and are unalterable by the Legis-
lature." The Federalist, LIX, LI. The history of the
times indicates beyond reasonable doubt that, if the
Constitution makers had claimed for this section the
latitude we are now asked to sanction, it would not have
been ratified. See Story on the Const., §§ 814, et seq.

Our immediate concern is with the clause which grants
power by law to regulate the "*manner of holding* elections
for Senators and Representatives"—not broadly to regu-
late them. As an incident to the grant there is, of course,
power to make all laws which shall be necessary and proper
for carrying it into effect. Art. I, § 8, cl. 18. Although
the Seventeenth Amendment now requires Senators to be
chosen by the people, reference to the original plan of se-
lection by the legislatures may aid in interpretation.

Who should participate in the specified elections was
clearly indicated—members of state legislatures and
those having "the qualifications requisite for electors
of the most numerous branch of the state legislature."
Who should be eligible for election was also stated. "No
person shall be a Representative who shall not have
attained the age of twenty-five years, and been seven
years a citizen of the United States, and who shall not,
when elected, be an inhabitant of that State in which he
shall be chosen." "No person shall be a Senator who
shall not have attained to the age of thirty years, and been
nine years a citizen of the United States, and who shall
not, when elected, be an inhabitant of that State for
which he shall be chosen." Two Senators were allotted
to each State and the method was prescribed for deter-
mining the number of Representatives. Subject to these
important limitations, Congress was empowered by law
to regulate the times, places and manner of holding the
elections, except as to the places of choosing Senators.
"These words are used without any veiled or obscure
significance " but in their natural and usual sense.

If it be practically true that under present conditions a designated party candidate is necessary for an election—a preliminary thereto—nevertheless his selection is in no real sense part of the manner of holding the election. This does not depend upon the scheme by which candidates are put forward. Whether the candidate be offered through primary, or convention, or petition, or request of a few, or as the result of his own unsupported ambition, does not directly affect the manner of holding the election. Birth must precede but it is no part of either funeral or apotheosis.

Many things are prerequisites to elections or may affect their outcome—voters, education, means of transportation, health, public discussion, immigration, private animosities, even the face and figure of the candidate; but authority to regulate the manner of holding them gives no right to control any of these. It is settled, *e. g.*, that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Congress. *Kidd* v. *Pearson*, 128 U. S. 1.

Elections of Senators by state legislatures presupposed selection of their members by the people; but it would hardly be argued that therefore Congress could regulate such selection. In the Constitutional Convention of 1787, when replying to the suggestion that state legislatures should have uncontrolled power over elections of members of Congress, Mr. Madison said: "It seems as improper in principle, though it might be less inconvenient in practice, to give to the state legislatures this great authority over the election of the representatives of the people in the general legislature, as it would be to give to the latter a like power over the election of their representatives in the state legislatures." Supplement to Elliot's Debates, vol. V, p. 402.

We cannot conclude that authority to control party primaries or conventions for designating candidates was bestowed on Congress by the grant of power to regulate the manner of holding elections. The fair intendment of the words does not extend so far; the framers of the Constitution did not ascribe to them any such meaning. Nor is this control necessary in order to effectuate the power expressly granted. On the other hand, its exercise would interfere with purely domestic affairs of the State and infringe upon liberties reserved to the people.

It should not be forgotten that, exercising inherent police power, the State may suppress whatever evils may be incident to primary or convention. As "Each House shall be the judge of the elections, returns and qualifications of its own members," and as Congress may by law regulate the times, places and manner of holding elections, the National Government is not without power to protect itself against corruption, fraud or other malign influences.

The judgment of the court below must be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE McKENNA concurs in this opinion as applied to the statute under consideration which was enacted prior to the Seventeenth Amendment; but he reserves the question of the power of Congress under that Amendment.

MR. CHIEF JUSTICE WHITE, dissenting from the opinion, but concurring with a modification in the judgment of reversal:

The conviction and sentence under review were based on an indictment charging a conspiracy to commit vio-

lations of the act of Congress known as the Corrupt Practices Act, as made applicable to state laws dealing with state nominating primaries for, and the ensuing state elections of, United States Senators and Representatives in Congress. The case is here by direct writ of error, because of the contention that primaries of that character are not subject to the regulating power of Congress, and as an incident there is involved the contention that, even if the act of Congress was constitutional, it had been prejudicially misconstrued. Sustaining the first of these contentions and therefore deciding the act to be unconstitutional, the court reverses and finally disposes of the case. Although I am unable to concur in the conclusion as to the want of power of Congress and in the judgment of reversal as rendered, I am nevertheless of opinion that there should be a judgment of reversal without prejudice to a new trial, because of the grave misapprehension and grievous misapplication of the statute upon which the conviction and sentence below were based. I state the reasons which control me as to both these subjects.

By an amendment to the Corrupt Practices Act of 1910, Congress, in 1911, dealt with state primaries for the nomination of Senators and Representatives in Congress and with the election after nomination of such candidates (Act of June 25, 1910, c. 392, 36 Stat. 822; Act of August 19, 1911, c. 33, § 8, 37 Stat. 25, 28). At that time there existed in the State of Michigan a law regulating state nominating primaries which included candidates for state offices as well as for the Senate and House of Representatives of the United States. These primaries were held in the month of August in each year preceding the November general election. By that law the result of the primaries determined the right to have a person's name placed as a candidate on the ballot at the general election, and, in the case of United States Senators,

provision was made for the return of the result of the primary to the state legislature before the time when the duty of that body to elect a Senator would arise.

The Seventeenth Amendment to the Constitution, providing for the election of United States Senators by popular vote, was promulgated in May, 1913. In June, 1914, Congress by legislation carrying out the Amendment provided that thereafter Senators should be elected by popular vote, and, where state laws to that effect existed, made them applicable. But, evidently to give time for the States to enact the necessary legislation substituting for election by the legislature the method of election established by the Amendment, it was provided that, where no law for primaries by popular vote as to Senators existed, that subject should be controlled by the state law regulating primaries for the nomination of Representative at Large, if provided for, and if not, by the provisions controlling as to primaries for general state officers, the operation of these latter provisions being expressly limited to a term of three years (Act of June 4, 1914, c. 103, 38 Stat. 384). Within the time thus fixed and before the election which was held in this case, the State of Michigan, in order to conform its laws to the Amendment, modified them so as to provide for the election of Senators by popular vote, and made the general nominating state primary law applicable to that condition (Act No. 156, Mich. Acts of 1915), and, by virtue of the Amendment, the act of Congress, and the state law just stated, the primary with which we are concerned in this case was held in August, 1918.

The plaintiff in error, Newberry, was a candidate for the nomination of the Republican party as United States Senator, and, having been nominated at such primary, became a candidate at the ensuing November election, and was returned as elected. Subsequently the indictment under which the conviction below was had was

presented, charging him and others, in six counts, with a conspiracy to commit violations of provisions of the Corrupt Practices Act relating to state nominating primaries as well as to the resulting general election. It is not at this moment necessary to describe the nature of these accusations further, since it is not questioned that the indictment charged a conspiracy to commit crimes within the intendment of the Corrupt Practices Act and hence involved the question of the constitutional power of Congress which the court now adversely decides and the basis for which I now come to consider.

As the nominating primary was held after the adoption of the Seventeenth Amendment, the power must have been sanctioned by that Amendment, but for the purpose of clarity I consider the question of the power, first from the provisions of the Constitution as they existed before the Amendment, and second in contemplation of the light thrown upon the subject by the force of the Amendment.

The provisions of §§ 2 and 3 of Article I of the Constitution, fixing the composition of the House of Representatives and of the Senate and providing for the election of Representatives by vote of the people of the several States and of Senators by the state legislatures, were undoubtedly reservoirs of vital federal power constituting the generative sources of the provisions of § 4, cl. 1, of the same Article, creating the means for vivifying the bodies previously ordained (Senate and House), that is, providing: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators."

As without this grant no state power on the subject was possessed, it follows that the state power to create primaries as to United States Senators depended upon

the grant for its existence. It also follows that, as the conferring of the power on the States and the reservation of the authority in Congress to regulate were absolutely coterminous, except as to the place of choosing Senators which is not here relevant, it results that nothing is possible of being done under the former which is not subjected to the limitation imposed by the latter. And this is illustrated by the legislation of Congress and the decisions of this court upholding the same. See, "Act to regulate the Times and Manner of holding Elections for Senators in Congress," approved July 25, 1866, 14 Stat. 243; Act of May 31, 1870, 16 Stat. 144; Act of July 14, 1870, 16 Stat. 254; Act of June 10, 1872, 17 Stat. 347; *Ex parte Siebold*, 100 U. S. 371; *Ex parte Clarke*, 100 U. S. 399; *Ex parte Yarbrough*, 110 U. S. 651; *United States* v. *Mosley*, 238 U. S. 383.

But it is said that, as the power which is challenged here is the right of a State to provide for and regulate a state primary for nominating United States Senators free from the control of Congress, and not the election of such Senators, therefore, as the nominating primary is one thing and the election another and different thing, the power of the State as to the primary is not governed by the right of Congress to regulate the times and manner of electing Senators. But the proposition is a suicidal one, since it at one and the same time retains in the State the only power it could possibly have as delegated by the clause in question and refuses to give effect to the regulating control which the clause confers on Congress as to that very power. And mark, this is emphasized by the consideration that there is no denial here that the States possess the power over the federal subject resulting from the provision of the Constitution, but a holding that Congress may not exert as to such power to regulate authority which the terms of the identical clause of the Constitution confer upon it.

But, putting these contradictions aside, let me test the contention from other and distinct points of view: (1) In last analysis the contention must rest upon the proposition that there is such absolute want of relation between the power of government to regulate the right of the citizen to seek a nomination for a public office and its authority to regulate the election after nomination, that a paramount government authority having the right to regulate the latter is without any power as to the former. The influence of who is nominated for elective office upon the result of the election to fill that office is so known of all men that the proposition may be left to destroy itself by its own statement.

(2) Moreover, the proposition, impliedly at least, excludes from view the fact that the powers conferred upon Congress by the Constitution carry with them the right "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers " (Art. I, § 8, cl. 18), and in doing so virtually disregards the previous legislative history and the decisions of this court sanctioning the same, to which we have referred, since that practice and those decisions unmistakably recognize that the power under the clause in question extends to all the prerequisite and appropriate incidents necessary to the discharge of the authority given.

(3) From a somewhat different point of view the same result is even more imperatively required. Thus, as has been seen, the election was had under the Seventeenth Amendment to the Constitution, providing for the election of Senators by popular vote instead of by the state legislatures. In the resolution providing for the passage of that Amendment through Congress, as first reported by Senator Borah on behalf of the judiciary committee, after making the changes necessary to substitute a provision causing Senators to be elected by popular vote instead of by the legislatures of the several States, the

provision of § 4 of Article I reserving to Congress the power "to make or alter," except as to places, the regulations adopted by the several States as to the "times, places and manner " of electing Senators, was omitted; thus leaving all power on the subject in the States, free from any regulating control of Congress. (S. Rep. 961, 61st Cong., 3d sess.)

There was division, however, concerning the matter, manifested by a proposition to amend the resolution, as reported, so as to retain the omitted provision, thus preserving the power of Congress as originally conferred (Cong. Rec., vol. 46, Part 1, p. 847). The legislative situation thus created was aptly stated by Senator Borah, referring to the report of the committee and to the proposition (submitted by Senator Sutherland of Utah) to amend that report and the resolution accompanying it. He said:

"In reference to the amendment which has been suggested by the Senator from Utah [Mr. Sutherland], it was considered at some length before the committee. The proposition is a simple one. As the joint resolution now stands, the times, places, and manner of electing United States Senators is left entirely to the State. The State may determine the rules and regulations, and the times, places, and manner of holding elections for United States Senators.

"If the amendment as offered by the Senator from Utah should prevail, then the matter would be left as it now is, subject to the supervision and control of Congress." [1]

After much consideration, the amendment offered by Senator Sutherland was carried.[2] But the reported resolution, as thus amended, did not pass during that Congress. In the first session of the following Congress, however, the 62d Congress, a resolution identical in

[1] Cong. Rec., vol. 46, Part 1, p. 851.

[2] Cong. Rec., vol. 46, Part 4, p. 3307.

terms with the one which had been reported in the Senate at the previous session was introduced in the House and passed the same.[1]   In the Senate the House resolution was favorably reported from the committee by Senator Borah,[2] accompanied, however, by a minority report by Senator Sutherland,[3] offering as a substitute a resolution preserving the complete power of Congress, as had been provided for in the Senate in the previous Congress, and an amendment to the same effect offered by Senator Bristow was subsequently adopted,[4] and as thus amended the resolution was ultimately submitted for ratification, and, as we have seen, was ratified and promulgated.   (38 Stat. 2049.)

When the plain purpose of the Amendment is thus seen, and it is borne in mind that, at the time it was pending, the amendment to the Corrupt Practices Act dealing with state primaries for nominating United States Senators which is now before us was in the process of consideration in Congress, and when it is further remembered that, after the passage of the Amendment, Congress enacted legislation, so that the Amendment might be applied to state senatorial primaries, there would seem to be an end to all doubt as to the power of Congress.

It is not disputable that originally instructions to representatives in state legislatures by party conventions or by other unofficial bodies, as to the persons to be elected as United States Senators, were resorted to as a means of indirectly controlling that subject and thus, in a sense, restricting the constitutional provision as to the mode of electing Senators.   The potentiality of instructions of that character to accomplish that result is

---

[1] H. Rep., No. 2, 62d Cong., 1st sess.
[2] Cong. Rec., vol. 47, Part 1, p. 787.
[3] S. Rep., No. 35, 62d Cong., 1st sess.
[4] Cong. Rec., vol. 47, Part 2, p. 1205.

amply shown by the development of our constitutional institutions as regards the electoral college, where it has come to pass that the unofficial nomination of party has rendered the discharge of its duties by the electoral college a mere matter of form. That in some measure at least a tendency to that result came about under the constitutional direction that Senators should be elected by the people [legislatures] would appear not doubtful. The situation on this subject is illustrated by a statement in a treatise by Haynes on "Election of Senators," 1906, p. 132, as follows:

"Notwithstanding our rigid Constitution's decree that the senators from the several States shall be elected by 'the legislatures thereof,' this act of the legislatures may be deprived of nearly all of its vitality. The election of President offers an illustration of the filching of actual power away from the electors in whom it is vested by law. When James Russell Lowell, a Republican elector for Massachusetts in 1876, was urged to exercise his independence and vote for Tilden, he declined, saying that 'whatever the first intent of the Constitution was, usage had made the presidential electors strictly the instruments of the party which chose them.' The Constitution remains unchanged, yet presidential electors. recognize that they have been stripped of all discretion. It appears that under certain conditions the election of Senators by state legislatures has been and can be made an equally perfunctory affair."

The growth of the tendency to make the indirect result thus stated more effective evidently was the genesis of the statutory primary to nominate Senators. See statement concerning an amendment to the constitution of Nebraska on that subject as early as 1875, in the same treatise, p. 141.

The large number of States which at this day have by law established senatorial primaries shows the develop-

ment of the movement which originated so long ago under the circumstances just stated. They serve to indicate the tenacity of the conviction that the relation of the primary to the election is so intimate that the influence of the former is largely determinative of the latter. I have appended in the margin a statement from a publication on the subject,[1] showing how well founded this conviction is and how it has come to pass that in some cases at least the result of the primary has been in substance to render the subsequent election merely perfunctory. Under these conditions I find it impossible to say that the admitted power of Congress to control and regulate the election of Senators does not embrace, as

---

[1] "In many western and southern states the direct primary method has been applied to the choice of United States senators as well as to state officers.[1] In the southern states, victory in such a primary, on the Democratic side, is practically the equivalent of an election, as there is but one effective party in that section of the country. The direct nomination of senators is generally accomplished under voluntary party regulations, as in Alabama, Arkansas, South Carolina, and Virginia. In other cases, however, this method of choice has been placed under legal protection, as in Florida (1901), Mississippi (1902), Louisiana (1906), and Texas (1907). Some northern states have also adopted this method of direct nomination. Among northern states, Wisconsin led the way in 1903, followed by Oregon in 1904, Montana in 1905, Iowa, Washington, Nebraska, North Dakota in 1907, Illinois, Kansas, New Jersey, Ohio, and Oklahoma in 1908. . . . In some of the states, as in Oregon, candidates for the legislature are afforded an opportunity to pledge themselves to vote for the party candidate receiving the highest vote in the regular election. In other cases a pledge is made to vote for the candidate receiving the highest number of votes in the primary.[2] " (Merriam, Primary Elections, 1908, pp. 83–85.)

[1] On this general topic, see the excellent treatise on The Election of Senators, by George H. Haynes (1906), especially c. XI.

[2] Oregon, 1904, § 13. In Washington the candidate may pledge himself to vote for the *party* choice for United States senator (1907, § 31). This latter is the general rule.

appropriate to that power, the authority to regulate the primary held under state authority.

(4) It is true that the plenary reservation in Congress of the power to control the States in the exercise of the authority to deal with the times, places, and manner of electing Senators and Representatives, as originally expressed in the Constitution, caused much perturbation in the conventions of the several States which were called upon to consider ratification, resulting from the fear that such power to regulate might be extended to and embrace the regulation of the election of the members of the state legislatures who were to exercise the power to elect Senators. It is further true that articles in the Federalist and other papers published at the time served to dispel the fear by directing attention to the fact that the regulating power of Congress only extended to the times and manner of electing Senators and did not include an authority, even by implication, to deal with the election of the state legislatures, which was a power reserved to the States. But this only served to emphasize the distinction between the state and federal power and affords no ground at this late day for saying that the reserved state power has absorbed and renders impossible of exercise the authority of Congress to regulate the federal power concerning the election of United States Senators, submitted, to the extent provided, to the authority of the States upon the express condition that such authority should be subordinate to and controlled by congressional regulation.

Can any other conclusion be upheld except upon the theory that the phantoms of attenuated and unfounded doubts concerning the meaning of the Constitution, which have long perished, may now be revived for the purpose of depriving Congress of the right to exert a power essential to its existence, and this in the face of the fact that the only basis for the doubts which arose in

the beginning (the election of Senators by the state legislatures) has been completely removed by the Seventeenth Amendment?

I do not stop to refer to the state cases concerning the distinction between state legislative power to deal with elections and its authority to control primaries, as I cannot discover the slightest ground upon which they could be apposite, since here an inherent federal right and the provision of the Constitution in dealing with it are the subjects for consideration.

Moreover, in passing, I observe that, as this case concerns a state primary law imposing obligatory results, and the act of Congress dealing with the same, it is obvious that the effect of individual action is wholly beside the issue.

The consequence to result from a denial to Congress of the right to regulate is so aptly illustrated by the case in hand that in leaving the question I refer to it. Thus, it is stated and not denied that, in the state primary in question, one of the candidates, as permitted by the state law, propounded himself at the primary election as the candidate for the nomination for Senator of both the Republican and the Democratic parties. If the candidacy had been successful as to both, the subsequent election would have been reduced to the merest form.

In view, then, of the plain text of the Constitution, of the power exerted under it from the beginning, of the action of Congress in its legislation, and of the amendment to the Constitution, as well as of the legislative action of substantially the larger portion of the States, I can see no reason for now denying the power of Congress to regulate a subject which from its very nature inheres in and is concerned with the election of Senators of the United States, as provided by the Constitution.

The indictment remains to be considered. It contained six counts. For the moment, it suffices to say that the

first four all dealt with a common subject, that is, a conspiracy between Newberry and others named to contribute and expend, for the purposes of the state primary and general election, more money than allowed by the Corrupt Practices Act. The fifth count charged a conspiracy on the part of the defendants to commit a great number, to wit, one thousand, offenses against the United States, each to consist of giving money and things of value to a person to vote for Newberry at said election, and a great number, to wit, one thousand, other offenses against the United States, each to consist of giving money and things of value to a person to withhold his vote from Henry Ford at said general election. The sixth count charged a conspiracy to defraud by use of the mails.

At the trial, before the submission of the case to the jury, the court put the fifth count entirely out of the case by instructing the jury to disregard it, as there was no evidence whatever to sustain it. The bribery charge, therefore, disappeared. The second, third and fourth counts, dealing, as I have said, with one general subject, were found by the court to be all in substance contained in the first count. They were, therefore, by direction of the court, either eliminated or consolidated with the first count. Thus, as contained in that count, the matters charged in the first four counts were submitted to the jury, as was also the sixth count; but the latter we need not further consider, as upon it there was a verdict of not guilty.

The case therefore reduces itself solely to the matters covered in the first count. That count charged a conspiracy on the part of the defendants, 135 in number, including Newberry, to commit an offense against the United States, that is, the offense on the part of Newberry of violating the Corrupt Practices Act by giving, contributing, expending and using and by causing to be given, contributed, expended and used, in procuring

his nomination and election as such Senator at said primary and general elections, a sum in excess of the amount which he might lawfully give, contribute, expend or use, and cause to be given, contributed, expended or used for such purpose under the laws of Michigan, and in excess of $10,000, to wit, the sum of $100,000; and on the part of the other defendants of aiding, counseling, inducing, and procuring Newberry as such candidate to give, contribute, expend and use, or cause to be given, contributed, expended or used, said large and excessive sum, in order to procure his nomination and election.

Conspiracy to contribute and expend in excess of the amount permitted by the statute was, then, the sole issue, wholly disassociated from and disconnected with any corrupt or wrongful use of the amount charged to have been illegally contributed and expended. As, putting out of view the constitutional question already considered, the errors assigned are based solely upon asserted misconstructions of the statute by the court in its charge to the jury, we bring the statute at once into view. It provides, so far as relevant to the case before us:

"No candidate for . . . Senator of the United States shall give, contribute, expend, use, or promise, or cause to be given, contributed, expended, used, or promised, in procuring his nomination and election, any sum, in the aggregate, in excess of the amount which he may lawfully give, contribute, expend, or promise under the laws of the State in which he resides: *Provided*, That . . . no candidate for Senator of the United States shall give, contribute, expend, use, or promise any sum, in the aggregate, exceeding ten thousand dollars in any campaign for his nomination and election: . . .."

Coming to deal with the statute, the court, after pointing out in the most explicit terms that the limitation on the amount which might be lawfully contributed and expended or caused to be contributed and expended in

the case at hand was $3,750 (that being the limitation imposed by the laws of Michigan adopted by the statute of the United States just quoted), then proceeded, over objections duly reserved, to instruct as to the significance of the statute, involved in the prohibitions, (a) against giving, contributing, expending, or using, and (b) against causing to be given, contributed, expended, or used, money in excess of that permitted by the statute, saying on these subjects as follows:

(a) "It is important, therefore, that you should understand the meaning of the language employed in this Corrupt Practices Act, and that you should understand and comprehend the effect and scope of the act, and the meaning of the language there employed, and the effect and scope and extent of the prohibition against the expenditure and use of money therein contained,

"The words 'Give, contribute, expend or use' as employed in this statute have their usual and ordinary significance, and mean furnish, pay out, disburse, employ, or make use of. The term 'To cause to be expended, or used' as it is employed in this statute, means to occasion, to effect, to bring about, to produce the expenditure and use of the money.

"The prohibition contained in this statute against the expenditure and use of money by the candidate is not limited or confined to the expenditure and use of his own money. The prohibition is directed against the use and expenditure of excessive sums of money by the candidate from whatever source or from whomsoever those moneys may be derived."

(b) "The phrase which constitutes the prohibition against the candidate 'Causing to be given, contributed, expended or used excessive sums of money,' is not limited and not confined to expenditures and use of money made directly and personally by himself. This prohibition extends to the expenditure and use of excessive sums of

money in which the candidate actively participates, or assists, or advises, or directs, or induces, or procures. The prohibition extends not only to the expenditure and use of excessive sums of money by the candidate directly and personally, but to such use and expenditure through his agency, or procurement or assistance.

"To constitute a violation of this statute knowledge of the expenditure and use of excessive sums of money on the part of the candidate is not sufficient; neither is it sufficient to constitute a violation of this statute that the candidate merely acquiesces in such expenditures and use. But it is sufficient to constitute a violation of this statute if the candidate actively participates in doing the things which occasion such expenditures and use of money and so actively participates with knowledge that the money is being expended and used."

Having thus fixed the meaning of the prohibitions of the statute, the court came to apply them as thus defined to the particular case before it, saying:

(c) "To apply these rules to this case: If you are satisfied from the evidence that the defendant Truman H. Newberry at or about the time that he became a candidate for United States Senator was informed and knew that his campaign for the nomination and election would require the expenditure and use of more money than is permitted by law and with such knowledge became a candidate, and thereafter by advice, by conduct, by his acts, by his direction, by his counsel, or by his procurement he actively participated and took part in the expenditure and use of an excessive sum of money, of an unlawful sum of money, you will be warranted in finding that he did violate this statute known as the Corrupt Practices Act."

. Whether the instructions marked (a) and (b), if unexplained, were, in view of the ambiguity lurking in many of the expressions used therein, prejudicially

erroneous, I do not think necessary to consider, since I see no escape from the conclusion that the instruction marked (c), which made application of the view of the statute stated in the previous passages (a) and (b), was in · clear conflict with the text of the statute and was necessarily of a seriously prejudicial nature, since in substance it announced the doctrine that, under the statute, although a candidate for the office of Senator might not have contributed a cent to the campaign or caused others to do so, he nevertheless was guilty if he became a candidate or continued as such after acquiring knowledge that more than $3,750 had been contributed and was being expended in the campaign. The error in the instruction plainly resulted from a failure to distinguish between the subject with which the statute dealt— contributions and expenditures made or caused to be made by the candidate—and campaign contributions and expenditures not so made or caused to be made, and therefore not within the statute.

There can be no doubt, when the limitations as to expenditure which the statute imposed are considered in the light of its context and its genesis, that its prohibitions on that subject were intended, not to restrict the right of the citizen to contribute to a campaign, but to prohibit the candidate from contributing and expending or causing to be contributed and expended, to secure his nomination and election, a larger amount than the sum limited as provided in the statute. To treat the candidacy, as did the charge of the court, as being necessarily the cause, without more, of the contribution of the citizen to the campaign, was therefore to confound things which were wholly different, to the frustration of the very object and purpose of the statute. To illustrate: Under the instruction given, in every case where to the knowledge of the candidate a sum in excess of the amount limited by the statute was contributed by citizens to the

campaign, the candidate, if he failed to withdraw, would be subject to criminal prosecution and punishment. So also, contributions by citizens to the expenses of the campaign, if only knowledge could be brought home to them that the aggregate of such contributions would exceed the limit of the statute, would bring them, as illustrated by this case, within the conspiracy statute and accordingly subject to prosecution. Under this view, the greater the public service, and the higher the character, of the candidate, giving rise to a correspondingly complete and self-sacrificing support by the electorate to his candidacy, the more inevitably would criminality and infamous punishment result both to the candidate and to the citizen who contributed.

As it follows from the considerations which I have stated that the judgment below was, in my opinion, clearly wrong and therefore should be reversed, it is not necessary that I should go further and point out how cogently under the case presented the illustrations just previously made apply to it. For the reasons stated, although I dissent from the ruling of the court as to the unconstitutionality of the act of Congress, I nevertheless think its judgment of reversal should be adopted, qualified, however, so as to reserve the right to a new trial.

MR. JUSTICE PITNEY, concurring in part:

I concur in the judgment reversing the conviction of plaintiffs in error, but upon grounds fundamentally different from those adopted by the majority: my view being that there is no constitutional infirmity in the act of Congress that underlies the indictment, but that there was an error in the submission of the case to the jury that calls for a new trial.

The constitutional question is so important that it deserves treatment at length.

The Federal Corrupt Practices Act (Act of June 25, 1910, c. 392, 36 Stat. 822; amended by Act of August 19, 1911, c. 33, 37 Stat. 25, 28) limits the amount of money that may be given, contributed, expended, used, or promised, or caused to be given, contributed, expended, used, or promised by a candidate for Representative in Congress or for Senator of the United States in procuring his nomination and election, to a sum not in excess of the amount he may lawfully give, contribute, expend, or promise under the laws of the State of his residence; with a proviso that in the case of a candidate for Representative the amount shall not exceed $5,000, and in the case of a candidate for Senator shall not exceed $10,000, in any campaign for nomination and election; and a further proviso that any assessment, fee, or charge made or levied upon candidates by the laws of the State, or moneys expended for the candidate's necessary personal expenses for travel and subsistence, stationery and postage, writing or printing (other than in newspapers), and distributing letters, circulars, and posters, and for telegraph and telephone service, shall not be regarded as an expenditure or considered as a part of the sum fixed as the limit of expense. Section 10 of the act (36 Stat. 824), renumbered as § 11 by the amendment (37 Stat. 26), prescribes fine or imprisonment for a willful violation of any of its provisions. The act and amendment were passed before the adoption of the Seventeenth Amendment, providing for the election of Senators by direct vote of the people (declared adopted May 31, 1913; 38 Stat. 2049); but it is clear—indeed undisputed—that, for present purposes, they are to receive the same construction and effect as if enacted after adoption of the Amendment.

The present case arose out of a campaign for nomination and election of a Senator in the State of Michigan, where a statute (Act No. 109, § 1, Mich. Pub. Acts, 1913) limits the amount of money that may be paid, and of

232.   PITNEY, BRANDEIS and CLARKE, JJ., concurring in part.

expenses that may be authorized or incurred by or on behalf of any candidate to be paid by him in order to secure his nomination to any public office in the State, to 25 per centum of one year's salary of the office, and imposes a similar limit upon expenditures by or on behalf of any candidate who has received the nomination. By § 19 of the same statute "public office" is made to apply to any national office filled by the voters of the State, as well as to the office of presidential elector and United States Senator. The acts of Congress, in connection with the statute of the State, limit the amount that a candidate for Senator of the United States may give, contribute, expend, use, or promise, or cause to be given, contributed, expended, used, or promised, in procuring his nomination and election, to $3,750 in the aggregate, aside from those expenditures that are specifically permitted without limit.

Plaintiffs in error were indicted and convicted in the United States District Court for a conspiracy (§ 37, Criminal Code) to commit an offense against the United States, to wit, the offense, on the part of Truman H. Newberry, of willfully violating the acts of Congress above referred to by giving, contributing, expending, and using, and by causing to be given, contributed, expended, and used, in procuring his nomination and election as Senator of the United States at the primary and general elections in the year 1918, a sum in excess of the amount thus limited, to wit, the sum of $100,000, and on the part of the other defendants of aiding, counseling, inducing, and procuring (§ 332, Criminal Code) said Truman H. Newberry so to give, contribute, expend, and use, and cause to be given, contributed, expended, and used said large sums of money in excess of the amounts permitted, etc.; no part of which money was to be expended for any of the purposes specifically permitted without limit; numerous overt acts being alleged to have been done by one

or more parties defendant to effect the object of the conspiracy.

The averments of the indictment and the evidence at the trial related especially to expenditures contemplated to be made, and in fact made, to bring about Mr. Newberry's selection at a nominating or primary election held in August, 1918, with only minor expenditures made after that date and in contemplation of the general election which was held in the following November. The case is brought to this court by direct writ of error, upon the fundamental contention that the acts of Congress, in so far as they assume to regulate primary elections and limit the expenditures of money that may be made or caused to be made by a candidate therein, are in excess of the power conferred upon Congress to regulate the "manner of holding elections for Senators and Representatives" by § 4 of Article I of the Constitution of the United States. This question was raised, but not decided, in *United States* v. *Gradwell*, 243 U. S. 476, 487–488; *Blair* v. *United States*, 250 U. S. 273, 278–279.

For reasons to be stated below, I consider it erroneous to treat the question as dependent upon the words of the cited section alone. I will, however, first deal with that section, viewing it in connection with other provisions immediately associated with it and here quoted:

"Article I. Section 1. All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

"Section 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature

232.   Pitney, Brandeis and Clarke, JJ., concurring in part.

(Section 3 is superseded by the Seventeenth Amendment, which provides):

"Article XVII.   The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, . . . The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures. . . ."

"Section 4.   The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators

. . . . .

"Section 5.   Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, . . ."

It is contended that Congress has no power to regulate the amount of money that may be expended by a candidate to secure his being named in the primary election; that the power "to regulate the manner of holding elections," etc., relates solely to the general elections where Senators or Representatives are finally chosen.  Why should "the manner of holding elections" be so narrowly construed?  An election is the choosing of a person by vote to fill a public office.  In the nature of things it is a complex process, involving some examination of the qualifications of those from whom the choice is to be made and of those by whom it is to be made; some opportunity for the electors to consider and canvass the claims of the eligibles; and some method of narrowing the choice by eliminating candidates until one finally secures a majority, or at least a plurality, of the votes.  For the process of elimination, instead of tentative elections participated in by all the electors, nominations by parties or groups of citizens have obtained in the United States from an early period.  Latterly the processes of nomin-

280            OCTOBER TERM, 1920.

PITNEY, BRANDEIS and CLARKE, JJ., concurring in part.    256 U. S.

ation have been regulated by law in many of the States, through the establishment of official primary elections. But in the essential sense, a sense that fairly comports with the object and purpose of a Constitution such as ours, which deals in broad outline with matters of substance and is remarkable for succinct and pithy modes of expression, all of the various processes above indicated fall fairly within the definition of "the manner of holding elections." This is not giving to the word "elections " a significance different from that which it bore when the Constitution was adopted, but is simply recognizing a content that of necessity always inhered in it. The nature of that instrument required, as Chief Justice Marshall pointed out in *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, "that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves."

It is said that § 4 of Art. I does not confer a general power to regulate elections, but only to regulate "the manner of holding" them. But this can mean nothing less than the entire mode of procedure—the essence, not merely the form, of conducting the elections. The only specific grant of power over the subject contained in the Constitution is contained in that section; and the power is conferred primarily upon the legislatures of the several States, but subject to revision and modification by Congress. If the preliminary processes of such an election are to be treated as something so separate from the final choice that they are not within the power of Congress under this provision, they are for the same reason not within the power of the States, and, if there is no other grant of power, they must perforce remain wholly unregulated. For if this section of the Constitution is to be strictly construed with respect to the power granted to Congress thereunder, it must be construed with equal

strictness with respect to the power conferred upon the States; if the authority to regulate the "manner of holding elections" does not carry with it *ex vi termini* authority to regulate the preliminary election held for the purpose of proposing candidates, then the States can no more exercise authority over this than Congress can; much less an authority exclusive of that of Congress. For the election of Senators and Representatives in Congress is a federal function; whatever the States do in the matter they do under authority derived from the Constitution of the United States. The reservation contained in the Tenth Amendment cannot properly operate upon this subject in favor of the state governments; they could not reserve power over a matter that had no previous existence; hence if the power was not delegated to the United States it must be deemed to have been reserved to the people, and would require a constitutional amendment to bring it into play—a deplorable result of strict construction.

But if I am wrong in this, and the power to regulate primary elections could be deemed to have been reserved by the States to the exclusion of Congress, the result would be to leave the general Government destitute of the means to insure its own preservation without governmental aid from the States, which they might either grant or withhold according to their own will. This would render the Government of the United States something less than supreme in the exercise of its own appropriate powers; a doctrine supposed to have been laid at rest forever by the decisions of this court in *McCulloch* v. *Maryland,* 4 Wheat. 316, 405, *et seq.; Cohens* v. *Virginia.* 6 Wheat. 264, 381, 387, 414; and many other decisions in the time of Chief Justice Marshall and since.

But why should the primary election (or nominating convention) and the final election be treated as things so separate and apart as not to be both included in § 4 of

Article I? The former has no reason for existence, no function to perform, except as a preparation for the latter; and the latter has been found by experience in many States impossible of orderly and successful accomplishment without the former.

Why should this provision of the Constitution—so vital to the very structure of the Government—be so narrowly construed? It is said primaries were unknown when the Constitution was adopted. So were the steam railway and the electric telegraph. But the authority of Congress to regulate commerce among the several States was extended over these instrumentalities, because it was recognized that the manner of conducting the commerce was not essential. And this court was prompt to recognize that a transportation of merchandise, incidentally interrupted for a temporary purpose, or proceeding under successive bills of lading or means of transport, some operating wholly intra-state, was none the less interstate commerce, if such commerce was the practical and essential result of all that was done. *The Daniel Ball*, 10 Wall. 557, 565; *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S. 498, 526, 527; *Ohio Railroad Commission* v. *Worthington*, 225 U. S. 101, 108, 110; *United States* v. *Union Stock Yard Co.*, 226 U. S. 286, 304; *Texas & New Orleans R. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111, 124.

Why is it more difficult to recognize the integral relation of the several steps in the process of election?

Congress, by the so-called Enforcement Act of May 31, 1870, c. 114, § 20, 16 Stat. 140, 145, and the supplement approved February 28, 1871, c. 99, §§ 1, 2, 3, 4, 16 Stat. 433, 434, prescribed a variety of regulations relating to elections of members of the House of Representatives, including provisions for safeguarding the registration of voters. These were carried into the Revised Statutes as §§ 2011, 2016, 2021, 2022, 5522. They were attacked

232.  PITNEY, BRANDEIS and CLARKE, JJ., concurring in part.

as unconstitutional in *Ex parte Siebold*, 100 U. S. 371, and were sustained as an exertion of the authority of Congress to pass laws for regulating and superintending such elections and for securing their purity—without suggestion that the registration of voters was not, for practical purposes, a part of the election itself and subject to regulation as such.  Yet, in point of causation, identification of voters is related to the election no more closely than is the naming of candidates.

It is said that if "the manner of holding elections" had been understood in a sense to include the nominating procedure, ratification of the Constitution by the state conventions could not have been secured.  I do not see how this can be confidently asserted, in view of the fact that, by the very hypothesis, the conventions ratified a specific provision for regulating the only manner of holding elections with which they were familiar—dealt with the entire subject without limitation.  Mr. Justice Story, in rehearsing the objections, and the reasoning by which they were met, with citations from the debates and from the Federalist, refers to no objection that would be more cogent, supposing the regulation were extended to nominating procedure, than it would be if the regulation were confined to the ultimate election.  Story Const., §§ 814–827.  The sufficient answer to all objections was found in Hamilton's "plain proposition, that *every government ought to contain in itself the means of its own preservation.*"  Federalist, No. 59.

What was said, in No. 60 of the Federalist, about the authority of the national government being *restricted* to the regulation of the times, the places, and the manner of elections, was in answer to a criticism that the national power over the subject "might be employed in such a manner as to promote the election of some favorite class of men in exclusion of others," as by discriminating "between the different departments of industry, or between

the different kinds of property, or between the different
degrees of property"; or by a leaning "in favor of the
landed interest, or the moneyed interest, or the mercantile
interest, or the manufacturing interest"; and it was to
support his contention that there was "no method of
securing to the rich the preference apprehended, but by
prescribing qualifications of property either for those who
may elect, or be elected," which formed no part of the
power to be conferred upon the national government,
that Hamilton proceeded to say that its authority would
be "expressly restricted to the regulation of the *times*,
the *places*, and the *manner* of elections." This authority
would be as much restricted, in the sense there intended,
if "the manner of elections " were construed to include
all the processes of election from first to last. The restric-
tion arose from the express qualifications prescribed for
members of House and Senate, and for those who were
to choose them; subject to which all regulation of pre-
liminary, as well as of final, steps in the election neces-
sarily would have to proceed.

In support of a narrow construction of the power of
Congress to regulate "the manner of elections " of its
membership, it is said there is a check against corruption
and kindred evils affecting the nominating procedure,
in the authority of each House to judge of the elections,
returns, and qualifications of its own members; the sug-
gestion being that if—to take a clear case—it appeared
that one chosen to the Senate had secured his election
through bribery and corruption at the nominating primary,
he might be refused admittance. Obviously, this amounts
to a concession that the primary and the definitive elec-
tion, whose legal separateness is insisted upon, are essen-
tially but parts of a single process; else how could the
conduct of a candidate with reference to the primary
have legitimate bearing upon the question of his election
as Senator? But the suggestion involves a fundamental

232.    Pitney, Brandeis and Clarke, JJ., concurring in part.

error of reasoning.  The power to judge of the elections and qualifications of its members, inhering in each House by virtue of § 5 of Art. I, is an important power, essential in our system to the proper organization of an elective body of representatives.  But it is a power to *judge*, to determine upon reasonable consideration of pertinent matters of fact according to established principles and rules of law; not to pass an arbitrary edict of exclusion. And I am unable to see how, in right reason, it can be held that one of the Houses of Congress, in the just exercise of its power, may exclude an elected member for securing by bribery his nomination at the primary, if the regulation by law of his conduct at the primary is beyond the constitutional power of Congress itself.  Moreover, the power of each House, even if it might rightfully be applied to exclude a member in the case suggested, is not an adequate check upon bribery, corruption, and other irregularities in the primary elections.  It can impose no penal consequences upon the offender; when affirmatively exercised it leaves the constituency for the time without proper representation; it may exclude one improperly elected, but furnishes no rule for the future by which the selection of a fit representative may be assured; and it is exerted at the will of but a single House, not by Congress as a law-making body.

But if I am wrong thus far—if the word "elections" in Art. I, § 4, of the Constitution must be narrowly confined to the single and definitive step described as an election at the time that instrument was adopted— nevertheless it seems to me too clear for discussion that primary elections and nominating conventions are so closely related to the final election, and their proper regulation so essential to effective regulation of the latter, so vital to representative government, that power to regulate them is within the general authority of Congress. It is matter of common knowledge that the great mass of

the American electorate is grouped into political parties, to one or the other of which voters adhere with tenacity, due to their divergent views on questions of public policy, their interests, their environment, and various other influences, sentimental and historical. So strong with the great majority of voters are party associations, so potent the party slogan, so effective the party organization, that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. As a result, every voter comes to the polls on the day of the general election confined in his choice to those few candidates who have received party nominations, and constrained to consider their eligibility, in point of personal fitness, as affected by their party associations and their obligation to pursue more or less definite lines of policy, with which the voter may or may not agree. As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made. Hence, the authority of Congress to regulate the primary elections and nominating conventions arises, of necessity, not from any indefinite or implied grant of power, but from one clearly expressed in the Constitution itself (Art. I, § 8, cl. 18)— "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." This is the power preservative of all others, and essential for adding vitality to the framework of the Government. Among the primary powers to be carried into effect is the power to legislate through a Congress consisting of a Senate and House of Representatives chosen by the people—in short, the power to maintain a law-making body representative in its character. Another is the specific power to regulate the "manner of holding elections for Senators and Representatives," conferred by § 4 of the first Article; and if this does not in

literal terms extend to nominating proceedings intimately related to the election itself, it certainly does not in terms or by implication exclude federal control of those proceedings.   From a grant to the States of power to regulate the principal matter, expressly made subject to revision and alteration by the Congress, it is impossible to imply a grant to the States of regulatory authority over accessory matters exclusive of the Congress.   And it is obvious that if clause 18 adds nothing to the content of the other express powers, when these are literally interpreted, it has no efficacy whatever and must be treated as surplusage.   It has not, heretofore, been so regarded.   The subject was exhaustively treated by Chief Justice Marshall, speaking for the court in the great case already referred to, *McCulloch* v. *Maryland*, 4 Wheat. 316, 411–424, where he pointed out, pp. 419, 420: "1st.   The clause is placed among the powers of Congress, not among the limitations on those powers. 2nd.   Its terms purport to enlarge, not to diminish the powers vested in the government.   It purports to be an additional power, not a restriction on those already granted."   According to the conclusive reasoning adopted in that case, whatever meaning may be attributed to § 4 of Art. I, there is added by clause 18 of §. 8 everything necessary or proper for carrying it into execution—which means, into practical and complete effect.

The passage of the act under consideration amounts to a determination by the law-making body that the regulation of primary elections and nominating conventions is necessary if the Senate and House of Representatives are to be, in a full and proper sense, representative of the people.   Not only is this true of those cases referred to in the report of the Senate Committee (Senate Rept. No. 78, 62d Cong., 1st sess., p. 2) where the parties are so unequally divided that a nomination by the majority party is equivalent to election; but it is true in every case

to the extent that the nominating processes virtually eliminate from consideration by the electors all eligible candidates except the few—two or three, perhaps—who succeed in receiving party nominations. Sinister influences exerted upon the primaries inevitably have their effect upon the ultimate election—are employed for no other reason. To safeguard the final elections while leaving the proceedings for proposing candidates unregulated, is to postpone regulation until it is comparatively futile. And Congress might well conclude that, if the nominating procedure were to be left open to fraud, bribery, and corruption, or subject to the more insidious but (in the opinion of Congress) nevertheless harmful influences resulting from an unlimited expenditure of money in paid propaganda and other purchased campaign activities, representative government would be endangered.

The question of the authority of Congress to determine that laws regulating primary elections are "necessary and proper for carrying into execution" the other powers specified, admits of but one answer—the same given by Chief Justice Marshall in the memorable case last cited (4 Wheat. 421): "We think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. *Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.*"

This principle has been consistently adhered to and liberally applied from that day until this. Among a multitude of illustrative cases that might be cited, some

232.    PITNEY, BRANDEIS and CLARKE, JJ., concurring in part.

recent notable, but not exceptional, ones may be instanced: *Second Employers' Liability Cases*, 223 U. S. 1, 49, holding that the power of Congress to regulate commerce among the States brings within its authority the relations between common carriers by rail and their employees engaged in such commerce; *Houston, East & West Texas Ry. Co.* v. *United States*, 234 U. S. 342, 350, 355, holding that the same power authorizes Congress to regulate rates of transportation in the internal commerce of a State, to the extent of preventing injurious discrimination against the movement of traffic from State to State; *Wilson* v. *New*, 243 U. S. 332, 353, holding that the power over interstate commerce extends to regulating the wages of the employees of common carriers engaged therein; *Selective Draft Law Cases*, 245 U. S. 366, 377, *et seq.*, sustaining an act imposing involuntary military duty upon the citizen as "necessary and proper for carrying into execution" the power to declare war, raise and support armies, and make rules for the government and regulation of the land and naval forces; *United States* v. *Ferger*, 250 U. S. 199, 205, upholding the authority of Congress to prohibit and punish the fraudulent making of spurious interstate bills of lading even in the absence of any actual or contemplated movement of commerce from State to State; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 155, 163, sustaining war time prohibition of the sale of distilled spirits for beverage purposes as a measure necessary and proper for carrying into execution the war power; *Jacob Ruppert* v. *Caffey*, 251 U. S. 264, 282, 299–301, sustaining an act prohibiting the manufacture and sale of non-intoxicating beer as "necessary and proper" to render effective a prohibition against intoxicants; *First National Bank* v. *Union Trust Co.*, 244 U. S. 416, 419, sustaining an act conferring upon national banks powers not inherently federal but deemed appropriate to enable such banks to compete with state banks having

like powers; and *Smith* v. *Kansas City Title & Trust Co.,*
255 U. S. 180, sustaining an act establishing federal land
banks and joint stock land banks having broad powers not
national in their character, but deemed by Congress to
be reasonably appropriate for performing certain limited
fiscal functions in aid of the national treasury.

It would be tragic if that provision of the Constitution
which has proved the sure defense of every outpost of
national power should fail to safeguard the very founda-
tion of the citadel.

But its function in preserving our representative
government has long been recognized. In *Ex parte Yar-
brough*, 110 U. S. 651, where the question was as to the
constitutionality of §§ 5508 and 5520, Rev. Stats.—
the question having arisen upon an indictment for a
conspiracy to intimidate a citizen of African descent in
the exercise of his right to vote for a member of Congress—
the court, by Mr. Justice Miller, said (p. 657): "That a
government whose essential character is republican, whose
executive head and legislative body are both elective,
whose most numerous and powerful branch of the legis-
lature is elected by the people directly [now true of both
branches], has no power by appropriate laws to secure
this election from the influence of violence, of corruption,
and of fraud, is a proposition so startling as to arrest
attention and demand the gravest consideration.   If
this government is anything more than a mere aggregation
of delegated agents of other States and governments, each
of which is superior to the general government, it must
have the power to protect the elections on which its exist-
ence depends from violence and corruption.   If it has not
this power it is left helpless before the two great natural
and historical enemies of all republics, open violence and
insidious corruption.   The proposition that it has no
such power is supported by the old argument, often heard,
often repeated, and in this court never assented to, that

when a question of the power of Congress arises the advocate of the power must be able to place his finger on words which expressly grant it.   .   .   .   It destroys at one blow, in construing the Constitution of the United States, the doctrine universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed.   This principle, in its application to the Constitution of the United States, more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers—a difficulty which the instrument itself recognizes by conferring on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted and all other powers vested in the government or any branch of it by the Constitution.   Article I, sec. 8, clause 18."

I conclude that it is free from doubt that the Congress has power under the Constitution to regulate the conduct of primary elections and nominating conventions held for choosing candidates to be voted for in general elections for Representatives and Senators in Congress, and that the provisions of the Act of August 19, 1911, 37 Stat. 26–28, in that behalf are valid.

Since the majority of the court hold that the act is invalid, it would serve no useful purpose to spend time in discussing those assignments of error that relate to the conduct of the trial.   It may be said, however, that, in my opinion, the trial court did not err in refusing to direct a verdict for the defendants for want of evidence of the alleged conspiracy; nor in instructing the jury that the prohibition of the statute against the expenditure and use of money by a candidate beyond the specified limit is not confined to his own money, but extends to the expenditure or use of excessive sums of money by him, from whatever source and from whomsoever derived; nor in instructing them that in order to warrant a ver-

dict of guilty upon an indictment for conspiracy it was not necessary that the Government should show that defendants knew that some statute forbade the acts they were contemplating, but only to show an agreement to do acts constituting a violation of the statute; their knowledge of the law being presumed.

I find prejudicial error, however, in that part of the charge which assumed to define the extent to which a candidate must participate in expenditures beyond the amount limited in order that he may be held to have violated the prohibition—an instruction vitally important because it was largely upon overt acts supposed to have been done in carrying out the alleged conspiracy that the Government relied to prove the making of the conspiracy and its character, and because, unless the purposes of defendants involved a violation of the Corrupt Practices Act, they were not guilty of a conspiracy to commit an "offense against the United States" within the meaning of § 37, Criminal Code.

The instruction upon this topic, excepted to and assigned for error, was as follows: "The phrase which constitutes the prohibition against the candidate 'Causing to be given, contributed, expended or used ' excessive sums of money, is not limited and not confined to expenditures and use of money made directly and personally by himself. This prohibition extends to the expenditure and use of excessive sums of money in which the candidate actively participates, or assists, or advises, or directs, or induces, or procures. The prohibition extends not only to the expenditure and use of excessive sums of money by the candidate directly and personally, but to such use and expenditure through his agency, or procurement, or assistance. To constitute a violation of this statute knowledge of the expenditure and use of excessive sums of money on the part of the candidate is not sufficient; neither is it sufficient to constitute a violation of this

statute that the candidate merely acquiesces in such expenditures and use. But it is sufficient to constitute a violation of this statute if the candidate actively participates in doing the things which occasion such expenditures and use of money and so actively participates with knowledge that the money is being expended and used. To apply these rules to this case: If you are satisfied from the evidence that the defendant, Truman H. Newberry, at or about the time that he became a candidate for United States Senator was informed and knew that his compaign for the nomination and election would require the expenditure and use of more money than is permitted by law and with such knowledge became a candidate, and thereafter by advice, by conduct, by his acts, by his direction, by his counsel, or by his procurement he actively participated and took part in the expenditure and use of an excessive sum of money, of an unlawful sum of money, you will be warranted in finding that he did violate this statute known as the Corrupt Practices Act."

However this may be regarded when considered in the abstract, the difficulty with it, when viewed in connection with the evidence in the case to which the jury was called upon to apply it, is that it permitted and perhaps encouraged the jury to find the defendants guilty of a conspiracy to violate the Corrupt Practices Act if they merely contemplated a campaign requiring the expenditure of money beyond the statutory limit, even though Mr. Newberry, the candidate, had not, and it was not contemplated that he should have, any part in causing or procuring such expenditure beyond his mere standing voluntarily as a candidate and participating in the campaign with knowledge that moneys contributed and expended by others without his participation were to be expended.

The language of the Corrupt Practices Act (37 Stat. 28) is: "No candidate . . . shall give, contribute, ex-

pend, use, or promise, or cause to be given, contributed, expended, used, or promised," etc. A reading of the entire act makes it plain that Congress did not intend to limit spontaneous contributions of money by others than a candidate, nor expenditures of such money except as he should participate therein. Of course, it does not mean that he must be alone in expending or causing to be expended the excessive sums of money; if he does it through an agent or agents, or through associates who stand in the position of agents, no doubt he is guilty; *qui facit per alium facit per se;* but unless he is an offender as a principal there is no offense. Section 332, Criminal Code, declares: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal." Clearly this makes anyone who abets a candidate in expending or causing to be expended excessive sums a principal offender; but it cannot change the definition of the offense itself as contained in the Corrupt Practices Act, so as to make a candidate a principal offender unless he directly commits the offense denounced. Spontaneous expenditures by others being without the scope of the prohibition, neither he nor anybody else can be held criminally responsible for merely abetting such expenditures.

It follows that one's entry upon a candidacy for nomination and election as a Senator with knowledge that such candidacy will come to naught unless supported by expenditure of money beyond the specified limit, is not within the inhibition of the act unless it is contemplated that the candidate shall have a part in procuring the excessive expenditures beyond the effect of his mere candidacy in evoking spontaneous contributions and expenditures by his supporters; and that his remaining in the field and participating in the ordinary activities of the campaign with knowledge that such activities furnish in

a general sense the "occasion" for the expenditure is not to be regarded as a "causing" by the candidate of such expenditure within the meaning of the statute.

The state of the evidence made it important that, in connection with that portion of the charge above quoted, the jury should be cautioned that unless it was a part of defendants' plan that Mr. Newberry should actually participate in giving, contributing, expending, using, or promising, or causing to be given, contributed, expended, used, or promised moneys in excess of the limited amount —either himself or through others as his agents—his mere participation in the activities of the campaign, even with knowledge that moneys spontaneously contributed and expended by others, without his agency, procurement, or assistance, were to be or were being expended, would not of itself amount to his causing such excessive expenditure. The effect of the instruction that was given may well have been to convey to the jury the view that Mr. Newberry's conduct in becoming and remaining a candidate with knowledge that spontaneous contributions and expenditures of money by his supporters would exceed the statutory limit, and his active participation in the campaign, were necessarily equivalent to an active participation by him in causing the expenditure and use of an excessive sum of money, and that a combination among defendants having for its object Mr. Newberry's participation in a campaign where money in excess of the prescribed limit was to be expended, even without his participation in the contribution or expenditure of such money, amounted to a conspiracy on their part to commit an offense against the act.

For error in the instructions in this particular the judgment should be reversed, with directions for a new trial.

MR. JUSTICE BRANDEIS and MR. JUSTICE CLARKE concur in this opinion.