**ELMORE v. RICE et al.**
**Civil Action No. 1702.**

District Court, E. D. South Carolina,
Columbia Division.

July 12, 1947.

Harold R. Boulware, of Columbia, S. C., and Thurgood Marshall and Robert L. Carter, both of New York City, for plaintiff.

Charles B. Elliott, Irvine F. Belser, and Christie Benet, all of Columbia, S. C., P. H. McEachin, of Florence, S. C., J. Perrin Anderson, of Greenwood, S. C., W. Brantley Harvey, of Beaufort, S. C., Edgar A. Brown, of Barnwell, S. C., William P. Baskin, of Bishopville, S. C., and Yancey A. McLeod, of Columbia, S. C., for defendants.

WARING, District Judge.

Plaintiff, George Elmore, is a duly and legally qualified elector under the Constitution and laws of the United States and of the State of South Carolina and is subject to none of the disqualifications for voting thereunder. This suit is brought by him to test the legality of the action of the defendants in not permitting him and other qualified Negro electors to vote in the Democratic Party's Primary held on August 13, 1946, in Richland County, which Primary was held for the purpose of nominating candidates on the Democratic ticket for the House of Representatives of the United States, and for various State offices. The rules of the Democratic Party restrict voting in its primaries to white persons. The plaintiff, George Elmore, is a Negro. Some of the defendants are election managers of Ward 9 Precinct in Richland County, South Carolina, and the others are members of the Richland County Democratic Executive Committee which has general charge and supervision of the conduct of the primaries and other functions of the Democratic Party in Richland County. This action is brought by the plaintiff on behalf of himself and others similarly situated.

The action is based upon the alleged rights of the plaintiff under the Constitution of the United States and particularly under Article 1, Sections 2 and 4, and the Fourteenth, Fifteenth, and Seventeenth Amendments. The jurisdiction of the court is invoked under Title 28 U.S.C.A. § 41 (1, 11, 14), and a declaratory judgment with injuction is prayed for under Title 28 U.S.C.A. § 400. It is alleged that the plaintiff and others in like situation have been deprived of the civil rights guaranteed them under Title 8 U.S.C.A. § 31, which is as follows:

"Race, color, or previous condition not to affect right to vote

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

And Title 8 U.S.C.A. § 43, which is as follows:

"Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

It is admitted and stipulated that the plaintiff George Elmore and certain other Negroes who were qualified to vote under the Constitution of the State of South Carolina presented themselves on August 13, 1946, at the regular polling place of Ward 9 Precinct in Richland County, South Carolina, during the regular hours that the polling place was open and requested ballots and permission to vote in the Democratic Primary, and that these requests were refused on the ground that they were not enrolled because they were not white Democrats; and that this refusal by the Primary Managers was in pursuance of the rules and instructions of the Chairman of the Richland County Democratic Executive Committee and the members of such Committee who were acting pursuant to the rules of the Democratic Party of South Carolina then in force, particularly because such rules limited membership to persons of the white race.

█ Upon the hearing of the case it was decided that the Court would first pass upon the question of a declaratory judgment and injunction, and that the prayer for money damages (alleged in the complaint to be $5,000) would be deferred for future submission to a jury in case it was determined that the plaintiff had stated and shown a cause of action.

Under Title 28 U.S.C.A. Section 41(11), the District Courts are given original jurisdiction of all suits "to enforce the right of citizens of the United States to vote in the several States," and the Federal Courts have undoubted jurisdiction over the right to vote in a primary provided it is determined to be an integral part of the election machinery of the State. United States v. Classic 313 U.S. 299, 61 S.Ct. 1031, 85 L. Ed. 1368; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110. On the question of jurisdiction, see also Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484. 76 L.Ed. 984, 88 A.L.R. 458; Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Chapman v. King, 5 Cir., 154 F.2d 460.

Of course there has never been any serious question that the constitution of the United States recognized the right of the Federal Government to control General Elections in which Federal Officers were chosen. However, it was for many years a doubtful question as to whether the federal jurisdiction and federal laws extended to primary elections. The issue was squarely faced in the famous case of Newberry v. United States, 256 U.S. 232, 41 S.Ct. 469, 65 L.Ed. 913 where the Court had to determine whether legislation attempting to regulate primaries was constitutional. The Court was evenly divided, four to four, on the question as to whether the federal government could regulate primaries. But the Justices voted five to four in declaring the act then under consideration unconstitutional, it having been passed before the Seventeenth Amendment was adopted. But even at so early a date, four of the Justices, in an opinion by Mr. Justice Pitney, took the position that a primary election should not be treated as a thing separate from the final election but should be considered as so closely related to the final election that proper regulation is essential.

The dissenting opinion discusses the matter at some length, is enlightening, and sounds as though it were enunciated by the present Supreme Court in view of its recent decisions to which I hereinafter advert.

Over the course of years, there has been a constant flow of litigation relative to the right to vote in elections as well as in primaries. This has been particularly true in certain of the states wherein various restrictions were imposed in attempts to impede the right of Negroes to vote. A num-

ber of cases which have been discussed at length and cited in briefs submitted to me denied the right of the Federal government to supervise primary elections even though they were created and regulated by state statutes. It might be interesting to follow and discuss many of these, but since the decisions in the Classic and Smith cases, supra, these older cases have really become of interest only from an historic standpoint. Perhaps the outstanding one of these is Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680. And under the law as laid down by that case, confirming and supplementing many other cases (which I deem unnecessary to cite for reasons above stated) a state had the right to enact laws governing primary elections and a political party operating thereunder might restrict the voters in the primary conducted by it according to racial distinctions. The Court there took the definite position that the privilege of membership in a party, with the right to vote for its nominees, is different from the right to vote in a General Election.

But the views of the Supreme Court of the United States in regard to these matters has suffered a drastic and complete change. And so far as we are at present concerned with the law of the land, except for an interest in prior views showing changes and development of the law, we need hardly look back of 1941 when the famous case of United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, was decided, and a few years later in 1944 Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987. These two cases now completely control and govern the matters under discussion.

In South Carolina for many years the Democratic Party has conducted primary elections for the choice of municipal, county, state and federal officers. It is a matter of common knowledge that for a great many years the Democratic Party has completely controlled the filling of offices in the State of South Carolina. For the purpose of this case and as shown by the stipulations, certain dates are fixed, and it is agreed that since 1900 every Governor, member of the General Assembly, United States Representative and United States Senator for the State of South Carolina, elected by the people of this State in the General Elections, was the nominee of the then existing Democratic Party of South Carolina, and that during the past 25 years the Democratic Party of South Carolina has been the only political party in this State to hold State-wide primaries for the nomination of candidates for Federal and State offices. The Constitution of South Carolina of 1895 recognized the primary as a part of the election machinery of the State and authorized the General Assembly to enact laws to govern these primaries. Article II, Section 10, is as follows:

"Primary elections.—The General Assembly shall provide by law for the regulation of party primary elections and punishing fraud at the same."

Article II of the Constitution is entitled "Right of Suffrage," and the whole Article, consisting of 15 sections, covers suffrage, including registration and elections, which goes to show that the State recognized a primary as an integral part of the elective process.

In accordance with the right given by the Constitution, the General Assembly from time to time adopted, modified, and amended the laws regulating primary elections, and in 1915 a complete comprehensive revision of the election laws, declaring and regulating the primary, was adopted.

We may therefore say without fear of contradiction that the Democratic Primary in South Carolina was regulated and controlled by direct State action and was an integral part of the election laws of the State. Prior to the decision in the Classic case, supra, there could be no doubt that a Negro had no right to be admitted to the primary elections or become a member of the Democratic Party in this State. But the decision in the Classic case threw a doubt on this. And in 1944 with the decision in Smith v. Allwright, supra, the status was entirely changed, and then instead of being even a doubtful matter, it was clearly evident that the Democratic Party in South Carolina, as then constituted and acting under the statutes enacted by its State, no

longer had the right to limit its members to whites and to exclude Negroes.

And this was clearly recognized by the officers and those in charge of the Democratic Party, as well as State and Federal officials, who were the same in many cases. As a matter of fact, the then Governor of the State of South Carolina, Olin D. Johnston (now United States Senator from this State), issued a proclamation calling for an Extraordinary Session of the General Assembly of South Carolina to convene on April 14, 1944. In that proclamation (dated April 12, 1944) he stated one of the specific purposes of the session was for "the purpose of safeguarding our elections, the repealing of all laws on the statute books pertaining to Democratic Primary elections." The General Assembly convened and received a message from the Governor in which he elaborated the purpose for which the extraordinary session was called and urged that it be limited "to the consideration of matters pertaining to elections and election laws." The Governor reviewed his former recommendations and the action of the General Assembly in 1943 in repealing certain primary election statutes( it was evident that this action had been taken because of the fears aroused by the Classic case, supra). The Governor then pointed out that the United States Supreme Court in a Texas decision (referring of course to Smith v. Allwright, supra) had reversed its former ruling "so that it now becomes absolutely necessary that we repeal all laws pertaining to primaries in order to maintain white supremacy in our Democratic Primaries in South Carolina." Among other things, the Governor also said:

"I know that the white Democrats in South Carolina will rally behind you in this matter of repealing all primary laws from the Statute books. I have always believed in action and not merely in words, especially when the protection and the preservation of morals and decency in government is involved. Now, is the time for us to act.

"I regret that this ruling by the United States Supreme Court has forced this issue upon us, but we must meet it like men. I further regret that certain agitators within and without South Carolina are taking advantage of this situation to create strife and dissension at the present time. These agitators are not friends of either race, but they are creating strife and dissension to further their own selfish gain.

"History has taught us that we must keep our white Democratic primaries pure and unadulterated so that we might protect the welfare and homes of all the people of our State.

"Throughout my administration I have opposed outside interference with the local government of this State. It is not my purpose now to agitate the race question, but in the interest of good government and for the protection of all the people of our State it is necessary that we face this problem in a calm, deliberate and statesmanlike manner.

"The Attorney General's Office, with the assistance of the Solicitors of this State, have been working diligently for several days upon the matter of finding all primary laws upon the statute books that must be repealed so that we might have a free, white Democratic primary which can nominate its candidates free and untrammeled without legislative sanction.

"After these statutes are repealed, in my opinion, we will have done everything within our power to guarantee white supremacy in our primaries of our State insofar as legislation is concerned. Should this prove inadequate, we South Carolinians will use the necessary methods to retain white supremacy in our primaries and to safeguard the homes and happiness of our people.

"White supremacy will be maintained in our primaries. Let the chips fall where they may!"

Thereafter, at this extraordinary session, lasting from April 14 to April 20, 1944, the General Assembly repealed a large number of statutes (approximately 150) all relating to State regulation of primaries and their organization and government or to elections held thereunder. The work seems to have been completely and thoroughly done insofar as I am informed. Every trace of statutory regulation of party primaries was

expunged from the statutes of this State. The General Assembly also adopted appropriate legislation looking to a repeal of that section of the Constitution providing for laws governing primaries (hereinbefore referred to), and at the next General Election this portion of the Constitution was repealed and is no longer in effect. Thus, because of the Smith v. Allwright decision, the State of South Carolina eliminated from its Constitution and statutes all regulation of political parties and primary elections, and there is now no *statutory* control either civil or criminal.

And the contention of the defendants in this case is that the State having thus completely renounced control of political parties and primaries held thereunder, these party primaries are private matters, subject to the determinations and whims of its members, and that they may include or exclude members as they desire, according to racial or any other tests.

On the other hand, the contention of the plaintiff is that the Democratic Party subsequent to 1944, and today, is the same party and organization as it was before; that it carries on and performs the function of choosing Federal, State and other .fficers, and is the real and only organization where the determination of selection of officers can be had; and that it is the only place where a citizen can exercise his right of suffrage where it will be of any use or moment. In other words, the plaintiff and those whom he represents, that is to say, Negroes who are qualified electors and citizens of this State, take the position that officers of the State and United States are chosen in South Carolina in the Democratic Primary, and that the General Election is a mere formality, following the primary choices.

The stipulations in this case show that in the Democratic Primary of August 1946 (the one in which plaintiff was denied the right to vote) there were cast for the office of Governor of the State 290,223 votes, whereas in the General Election in November of that year the votes for that same office amounted to only 26,326. It is further shown that since 1900, every Governor, and all members of the General Assembly, and also all United States Representatives and United States Senators, elected by the people of South Carolina in the General Elections, were the nominees of the then existing Dmocratic Party of the State; and that during the past 25 years the Democratic Party is the only political party in this State which has held statewide primaries for the nomination of candidates for Federal and State offices.

As heretofore stated, a change in the attitude of the courts in regard to the applicability of federal law to primaries came about in 1941, and the famous case of United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, was decided. The Court spoke through the able and comprehensive opinion of Mr. Justice (later Chief Justice) Stone. In that case, which arose in Louisiana, an indictment was returned against the Commissioners of Elections conducting a primary election (under the Louisiana law) to nominate a candidate of the Democratic Party for Representative in Congress. They were charged with fraud in the conduct of the election and the question in issue was whether the federal statutes applied to the defendants' actions in interfering with the right of qualified voters to cast their ballots and the right of candidates to have their votes properly counted. The Supreme Court of the United States in unmistakable language declared that the primary election as conducted in the State of Louisiana was an integral part of the election machinery and that the Constitution and laws of the United States covered the conduct of the same where it was used to choose a congressman. Mr. Justice Stone says, 313 U.S. pages 318 and 319, 61 S.Ct. 1039:

"Long before the adoption of the Constitution the form and mode of that expression had changed from time to time. There is no historical warrant for supposing that the framers were under the illusion that the method of effecting the choice of the electors would never change or that if it did, the change was for that reason to be permitted to defeat the right of the people to choose representatives for Congress which the Constitution had guaranteed. The right to participate in the choice of representatives for Congress includes, as we have said, the right to cast a ballot and

to have it counted at the general election whether for the successful candidate or not. Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2. And this right of participation is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative. Here, even apart from the circumstance that the Louisiana primary is made by law an integral part of the procedure of choice, the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative. Moreover, we cannot close our eyes to the fact already mentioned that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon the rejection at the election of the choice made at the primary and may thus operate to deprive the voter of his constitutional right of choice. This was noted and extensively commented upon by the concurring Justices in Newberry v. United States, supra, 256 U.S. [232], 263–269, 285, 287, 41 S.Ct. [469], 476–478, 484, 65 L.Ed. 913.

"Unless the constitutional protection of the integrity of 'elections' extends to primary elections, Congress is left powerless to effect the constitutional purpose, and the popular choice of representatives. is stripped of its constitutional protection save only as Congress, by taking over the control of state elections, may exclude from them the influence of the state primaries."

Particular attention should be called to that part of the opinion above quoted where the Court says: "Where the state law has made the primary an integral part of the procedure of choice, OR *where in fact the primary effectively controls the choice,* the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2." (Emphasis added.) So it will be seen that the Court presents an alternative, namely, where by state law the primary is declared a part of the procedure, *or* where it amounts to the same. The position of the plaintiff in this case is based squarely upon that language.

In 1944 the Supreme Court of the United States decided the equally famous case of Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987. That case arose in Texas. Smith, a Negro citizen of Harris County, Texas, brought a suit for damages against Allwright and others who were election judges, the claim being based upon the refusal of these officials to give Smith a ballot or permit him to cast one at the primary for the nomination of a Democratic candidate for the United States Senate and House of Representatives and for various state offices. The refusal is alleged to have been solely because of the race and color of the proposed voter. The action is brought on the ground of violation of Title 8 U.S.C.A. §§ 31 and 43, in that the petitioner was deprived of the rights secured to him by Article I, Sections 2 and 4 of the Constitution of the United States and of the Fourteenth, Fifteenth and Seventeenth Amendments thereof. The District Court denied the relief sought, basing its decision upon the authority of Grovey v. Townsend, supra. The Supreme Court agreed to review the matter upon a petition for certiorari to resolve the claimed inconsistency between the decision in the Grovey case and the Classic case, supra. The decision in the Smith case followed completely the argument and decision in the Classic case, and especially repudiated and directly overruled the Grovey case.

The Smith case, following the Classic case, holds in effect that a primary is an integral part of the election machinery. It is true that in Texas the primary was covered by statues. Nevertheless, the Court holds that a federal court must for itself examine into the facts. The opinion by Mr.

Justice Reed, 321 U.S. at page 662, 64 S. Ct. 764, says:

"We are thus brought to an examination of the qualifications for Democratic primary electors in Texas, to determine whether state action or private action has excluded Negroes from participation. Despite Texas' decision that the exclusion is produced by private or party action, Bell v. Hill, supra, [123 Tex. 531, 74 S.W.2d 113], Federal Courts must for themselves appraise the facts leading to that conclusion. It is only by the performance of this obligation that a final and uniform interpretation can be given to the Constitution, the "supreme Law of the Land."

and again at page 321 U.S. 664, 64 S.Ct. 765:

"The United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any state because of race. This grant to the people of the opportunity for choice is not to be nullified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281."

 Now it is clear from the consideration of the two foregoing leading cases that the law of our land has been materially changed since the early decisions that gave to the state a free hand in organization, governing and using primary elections. A primary conducted in accordance with state law is distinctly a part of the election machinery and in such a primary it is a violation of the constitutional and statutory rights of any qualified elector to exclude him from voting by reason of race or color.

Before further considering the facts in the case at bar, it is proper to consider a very recent case particularly relied upon by the defendants, which is that of Chapman v. King, decided by the Circuit Court of Appeals for the Fifth Circuit in March 1946, and reported in 154 F.2d 460.

Portions of the opinion in that case are closely in line with the arguments submitted by defendants. But in order to understand the full implication and meaning, it is proper to review the entire case from its inception. King, a Negro, brought suit against Chapman and others, members of the Democratic Executive Committee of Muscogee County, Georgia, to recover damages for alleged deprivation of the right to vote in a Democratic Primary. The case was heard by the District Court for the Middle District of Georgia, and the District Judge filed full and complete findings of fact, conclusions of law, and opinion. See King v. Chapman, D.C., 62 F.Supp. 639. That case was a suit brought under Title 8 U.S.C.A. §§ 31 and 43, seeking damages for deprivation of civil rights guaranteed by the Constitution, especially the Fifteenth Amendment. The Georgia Primary statutes restrict voters therein to whites. The District Court says, 62 F. Supp. page 650:

"The Democratic Party is the dominant and controlling political party in Georgia. No other party has held a statewide primary during the past 40 years. Since 1900 Democratic nominees for United States Senator, members of the House of Representatives, Governor, and other Statehouse officers, nominated at primaries, have been elected in the ensuing general election. The nominees at the 1944 Primary were so elected.

"So, we conclude from this long established practice that the primary is in fact an integral part of the electoral process of this state. It may fairly be said that it is the hub of the process. When the Democratic Party holds a primary in this state, the system is substantially the same, in substance and objective, as the Texas and Louisiana systems.

"As I understand the holding and the meaning of Smith v Allwright, it is controlling here.

"The defendants acting as the duly constituted authorities of the Democratic Party, in refusing to permit plaintiff to vote in the Primary of July 4, 1944, solely on account of his race and color, deprived the

plaintiff of a right secured to him by the Constitution and laws of the United States, and was in violation of the Fourteenth, Fifteenth, and Seventeenth Amendments.

"Plaintiff has a cause of action and is entitled to recover. Appropriate orders will be entered."

The Court held that the plaintiff was entitled to damages. The case was appealed to the Circuit Court of Appeals. The decision of the District Court was affirmed in the following language, 154 F.2d page 464:

"We think these provisions show that the State, through the managers it requires, collaborates in the conduct of the primary, and puts its power behind the rules of the party. It adopts the primary as a part of the public election machinery. The exclusions of voters made by the party by the primary rules become exclusions enforced by the State and when these exclusions are prohibited by the Fifteenth Amendment because based on race or color, the persons making them effective violate under color of State law a right secured by the Constitution and laws of the United States within the meaning of the statute which is here sued on."

The defendants in the case at bar quote some of the language of the opinion of the Circuit Court of Appeals which seems to agree with their views. All of this, however, is obiter dicta since the appellate court affirms the decision of the District Judge, whose decision is squarely based upon the language hereinabove quoted. The Circuit Court of Appeals having affirmed the District Court, the defendant in the original suit filed a petition for writ of certiorari to the United States Supreme Court, but this was denied. 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025. Argument has been made that the denial of certiorari approves all of the language of the Circuit Court of Appeals, but of course this argument is without basis. It was the defendant who petitioned the Supreme Court. He lost the case in the District Court, lost it in the Circuit Court of Appeals, and the Supreme Court refused to interfere with either decision. Therefore the denial of certiorari may be considered as an affirmance of the District Court's views and decree. Of course in passing upon a petition of certiorari, the Supreme Court looks to the decision and the result and not to dicta which do not sustain the final result. Moreover:

"The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." United States v. Carver, 260 U.S. 482-490, 43 S.Ct. 181, 182, 67 L.Ed. 361; Atlantic Coast Line R. Co. v. Powe, 283 U.S. 401-403, 51 S.Ct. 498, 75 L.Ed. 1142.

It has been suggested that the action of the State in repealing all of the suffrage statutes amounted to a deprivation of the right of suffrage. The doctrine is somewhat novel but interesting. The argument is that under the law of South Carolina, as it stood before April 1944 and as construed by the Supreme Court decisions, Negroes had a right to vote in the primary as then constituted. And, therefore, when the legislature took action, although this action was in the form of repeal, it deprived these citizens of a right which they then had, and that the act of the legislature, while negative in form, was really positive. It has also been suggested that inaction by a State may amount to denial of equal protection. See Catlette v. United States, 4 Cir., 132 F. 2d 902, 907 (Opinion by Dobie, C. J., citing McCabe v. Atchison T. & S. F. R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208.) However, I think it unnecessary to elaborate this further as this opinion will rest upon entirely different grounds

And so this case must be determined by examining the status of the present Democratic Primary in the State of South Carolina. The foregoing statement of the legal effect of the Classic and Smith decisions was clearly recognized by Governor Johnston when he called the extraordinary session of the South Carolina General Assembly in 1944, and we are therefore forced to examine what has happened since and the result of the abrogation of those statutes and as to whether the Democratic Party

of South Carolina has sloughed its official skin and become a private organization. At the hearing of the cause, counsel filed stipulations of agreed facts, but concluding that more light should be shed upon the situation, so that all facts would be available to this Court and the matter might be decided for all time, the Trial Judge, of his own motion, called a witness to the stand to testify more fully as to the workings of the Democratic Party, its primaries and machinery. The Chairman of the State Democratic Executive Committee took the stand and testified quite frankly and freely.

From the stipulations and the oral testimony and from examination of the repealed statutes and of the rules of the State Democratic Party which were put in evidence, we may briefly summarize the organization and methods of the Democratic Party in this State, both before and after 1944. Prior to 1944, as shown by the statutes set forth in the Code of South Carolina and from an examination of the rules of the party published in 1942, the general setup, organization and procedure of the Party may be generally stated as follows: In the year 1942 (a year wherein certain primaries and general elections were to be held) organizations known as clubs in various wards (in cities), voting precincts, or other subdivisions, met at a time and places designated by the State organization. The members of these clubs were the persons who had enrolled to vote in the primary held two years before and whose names were on the books of the clubs, which were the voting lists used at such preceding primary. At these club meetings, officers were elected, including a County Executive Committeeman from each club and also delegates to a County Convention. Shortly thereafter a County Convention was held in each County in the State, where the delegates elected its Convention officers, including a member of the State Executive Committee and delegates to the State Convention. And shortly thereafter a State Convention was held, at which these delegates from the County organizations assembled, elected their presiding officers and a Chairman of the State Executive Committee

(composed of one committeeman from each County), and made rules and regulations for the conduct of the Party and of primaries. These rules and regulations were in conformity with the statute law of the State. The State Executive Committee was the governing body and the Chairman its chief official. The Convention repealed all previous rules and regulations and adopted a new set, these being however substantially the same as before with some slight amendments and changes, and of course new provisions for dates of primaries and other details.

In 1944 substantially the same process was gone through, although at that time and before the State Convention assembled, the statutes had been repealed by action of the General Assembly, heretofore set out. The State Convention that year adopted a complete new set of rules and regulations, these however embodying practically all of the provisions of the repealed statutes. Some minor changes were made but these amounted to very little more than the usual change of procedure in detail from year to year. The parties to this cause have filed schedules setting forth the detailed changes, the one side attempting to show that the changes were of form and not of matter, and the other attempting to point out material changes. One of the main items of change was to strike out the word "election" throughout the rules. It was undoubtedly the intention of the parties in charge of revamping the Democratic Party to eliminate the word "election" wherever it occurred in the rules, substituting instead the word "primary" or "nominating primary." In 1944 the State Convention also elected delegates to the National Democratic Convention as it had always done in years of Presidential Elections.

In 1946 substantially the same procedure was used in the organization of the Democratic Party and another set of rules adopted which were substantially the same as the 1944 rules, excepting that the voting age was lowered to 18 and party officials were allowed the option of using voting machines, and the rules relative to absentee voting were simplified (absentee voting had heretofore been controlled by cer-

tain statutes repealed in 1944, 43 St. at Large, p. 2231. See Code of South Carolina, Sections 2406–2416.) It is pointed out that the word "election," although claimed to have been entirely eliminated, was still used in Rules 25, 27, 32 and 48.

All of these matters are heavily stressed in arguments and in briefs submitted to me. I find them interesting, perhaps significant, but hardly controlling. The intention of the General Assembly and of the parties in charge of the Democratic Party in this State to eliminate "election" from the rules seems to have been clear and distinct, and it is fair to assume that leaving the word "election" in a few of the rules was a mere oversight. On the other hand, the changing of the voting age and allowing voting machines to be installed were minor matters of procedure and cannot be considered to materially affect the question.

And so we are faced with the final decision as to whether or not the present Democratic Party of South Carolina, because it is no longer governed by State statutes, is a private organization and (as was said in argument) must be treated as a private, business or social club, with which the State and National governments have no concern; or is it after all the determining body in the choice of National and State officers in South Carolina, or to use the old homely illustration, is it the same horse although of a somewhat different color?

 And so it becomes necessary to consider the real effect of the repeal of the primary statutes of 1944. It is conceded that there is now no law in South Carolina, in its Constitution or on its statute books, governing primaries; and the defendants take the position that the United States Constitution and the laws enacted thereunder apply only to the acts of the State as represented by its legal enactments. But when we compare the present status of the Democratic Primary in this State, is it materially different from its status prior to 1944? As has been said, it is common knowledge that during the long years following the war between the states and the adoption of the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution

of the United States there have been repeated attempts to restrict voting privileges in many parts of this country. The constitutional amendments following the bloody conflict of the 1860s came upon and to a people totally unprepared for the change in the status and relationship of the white and black races. The potential voters in the former slave holding states were about doubled by the new federal laws and every effort was made to prevent a deluge of untrained, unlettered, and unprepared citizens from taking over control of the state government. That these efforts and the methods adopted were both born of necessity may be argued with show of reason. But many years and several generations have passed since the time such necessity arose and existed. Constitutions, Statutes and litigation from time to time have clarified and modernized the matter of suffrage in these United States.

It may be and in fact is a fascinating study to determine whether a universal suffrage is the best method of governing a country. In the golden days of Greece, there were many slaves. The Roman Empire had many opinions and changes as to granting suffrage to people of other and conquered lands. The idea of free voting and suffrage practically disappeared in the Middle Ages, and even today in many countries the right to cast a ballot is extremely limited and in some only the members of the one party controlling the country, even though that party be made up of a minority of its inhabitants, may cast a ballot. But in these United States the time has passed for a discussion of whether we should have universal suffrage, irrespective of our views as to its desirability. The Constitution and laws of the United States provide for it and forbid discrimination because of race or creed. A free ballot to be freely exercised by all the citizens is the established American way of government. In the argument in this case, frequent reference was made to the desirability or undesirability of whites and blacks voting in the same primary, and it was suggested that the Negroes have a separate primary from the whites. It was further suggested that the parties in South Carolina are substantially

the same as private clubs; and that a private club has a right to choose its membership and the members to determine with whom they wish to associate. Of course that is true of any private club or private business or association, but private clubs and business organizations do not vote and elect a President of the United States, and the Senators and members of the House of Representatives of our national congress; and under the law of our land, all citizens are entitled to a voice in such selections. It has been stated, and I believe it is a fact, that South Carolina is the only State which now conducts a primary election solely for whites. Since the Classic case Negroes are voting in the Louisiana Primaries. Since Smith v. Allwright, Negroes are voting in Texas, and even in Georgia since Chapman v. King, Negroes vote in the Democratic Primaries. I cannot see where the skies will fall if South Carolina is put in the same class with these and other states.

It is true that the General Assembly of the State of South Carolina repealed all laws relating to and governing primaries, and the Democratic Party in this State is not under statutory control, but to say that there is any material difference in the governance of the Democratic Party in this State prior, and subsequent, to 1944 is pure sophistry. The same membership was there before and after, the same method of organization of club meetings, of delegates to County Conventions, delegates to State Conventions, arranging for enrollment, preparation of ballots, and all the other details incident to a primary election. Of course there were some changes from time to time to meet changing conditions. There has always been and probably always will be necessity for some amendments and modifications. An examination of the primary statutes running back through the years will disclose amendments and minor changes in them also from time to time. The lowering of the voting age and the permission to use voting machines were merely incidents in the conduct of the primaries. To say that this is not the action of the State is evading the facts. Title 8 U.S.C.A. § 31 refers to any "constitution, law, custom, usage, or regulation of any State." The method used in the present Democratic Party of South Carolina is distinctly the same "custom and usage" that has been in use long before 1944. As a matter of fact, it is a continuing and continuous process and has been so for many years, and the repeal of the statutes heretofore referred to makes practically no difference whatsoever in its life and growth. When the General Assembly, answering the call of Governor Johnston, met in extraordinary session, it was wholly and solely for the purpose of preventing the Negro from gaining a right to vote in the primaries as granted under the doctrine of the Smith v. Allwright case. There was no concealment as to the reason for this call. And although the General Assembly had repealed all of the laws on the subject, the State Democratic Party, composed of the same persons who voted in the primaries two years before, had its meetings in its same clubs in the same precincts, had the same kind of County Conventions and delegates, had the same kind of State Conventions and delegates, and adopted rules that were almost verbatim to the statutes that had been repealed. While the *General Assembly* repealed the laws governing the primaries, *the people of the State* assembled in convention and enacted practically the same rules. These may not be laws or statutes in name but they certainly amount to *"custom, usage, or regulation"* and are the acts of the *people*. There was no evasion in the purpose of the Governor and members of the General Assembly and why should there now be evasion of the issue here presented? For too many years the people of this Country, and perhaps particularly of this State, have evaded realistic issues. In these days when this Nation and the Nations of the world are forced to face facts in a realistic manner, and when this country is taking the lead in maintaining the democratic process and attempting to show to the world that the American government and the American way of life is the fairest and best that has yet been suggested, it is time for us to take stock of our internal affairs.

528

"Our case for democracy should be as strong as we can make it. It should rest on practical evidence that we have been able to put our own house in order.

"For these compelling reasons, we can no longer afford the luxury of a leisurely attack upon prejudice and discrimination. There is much that state and local governments can do in providing positive safeguards for civil rights. But we cannot, any longer, await the growth of a will to action in the slowest state or the most backward community.

"Our National Government must show the way."

The foregoing words were spoken by the leader of the Democratic Party, President Truman, in an address delivered on June 29, 1947.

It is time for South Carolina to rejoin the Union. It is time to fall in step with the other states and to adopt the American way of conducting elections.

I am of the opinion that the present Democratic Party in South Carolina is acting for and on behalf of the people of South Carolina; and that the Primary held by it is the only practical place where one can express a choice in selecting federal and other officials. Racial distinctions cannot exist in the machinery that selects the officers and lawmakers of the United States; and all citizens of this State and Country are entitled to cast a free and untrammelled ballot in our elections, and if the only material and realistic elections are clothed with the name "primary", they are equally entitled to vote there.

The prayer of the complaint for a declaratory judgment will therefore be granted by which it will be adjudged that the plaintiff and others similarly situated are entitled to be enrolled and to vote in the primaries conducted by the Democratic Party of South Carolina, and the defendants and their successors in office will be enjoined from excluding qualified voters from enrollment and casting ballots by reason of their not being persons of the white race. Appropriate findings of fact and conclusions of law and an order carrying the foregoing into effect will be entered.