BROWN v. BASKIN et al.

No. 1964.

United States District Court
E. D. South Carolina.
Charleston Division.

Nov. 26, 1948.

Harold R. Boulware, of Columbia, S. C., Edward R. Dudley, Thurgood Marshall and Constance Baker Motley, all of New York City, for plaintiff.

Robert McC. Figg, Jr., of Charleston, S. C., Sidney S. Tison, of Bennettsville, S. C., Eugene S. Blease, of Newberry, S. C., George Warren, of Hampton, S. C., Price & Poag and Jas. H. Price, all of Greenville, and Thomas A. Babb, of Laurens, S. C., for defendant.

WARING, Chief Judge.

The plaintiff in this action is a Negro residing in Beaufort County, South Carolina, a native born citizen of the United States, more than 21 years of age, who is a duly and legally qualified elector under the Constitution and laws of the United States and of the State of South Carolina, has paid his poll tax and is subject to none of the disqualifications provided for voting under the laws of the Nation or the State. He signed the books of enrollment of the Democratic Party in South Carolina, but subsequently his name was erased therefrom and the party officials informed him that he would not be permitted to enroll as a member of the party, and that he could participate in the primary elections to be held in South Carolina only as provided in the rules and provisions adopted by the Democratic Party in its 1948 convention.

This action was brought against William P. Baskin, State Chairman of the Democratic Party of South Carolina and a large number of other parties, some of whom were members of the State Executive Committee and some of whom were the Chairmen of the various county committees.

The matter came on for a hearing on a prayer for a temporary injunction and resulted in an Order granting such injunction based upon the opinion, Findings of Fact and Conclusions of Law filed July 20, 1948. See Brown v. Baskin, D. C., 78 F.Supp. 933. The injunction Order was modified in some particulars by Order filed July 22, 1948.

The matter now comes before me on the prayer of the complaint for an Order of permanent injunction. At the hearing in July the County Chairmen of three counties of South Carolina made returns showing that they had fully complied with the law and on the showing made were dismissed as party defendants. At the hearing for permanent injunction the County Chairman of Ridgeland County has made a like showing and has been dismissed by separate Order. The case remains for consideration against the other defendants.

All of the facts are quite fully set out in the Opinion referred to and need not be repeated here. At the hearing a stipulation was entered into that all of the testimony taken on the application for a preliminary injunction should be considered and various other facts and conditions were stipulated. The Court will take judicial notice of the fact that the temporary injunction was obeyed by the parties and that a primary election was had and no reports of violation were made to this Court. It is a matter of common knowledge that a large number of Negroes voted after having been enrolled as provided in the Order for Preliminary Injunction. No new facts or circumstances were introduced at this hearing and the matter was submitted after argument.

On behalf of the defendants it was argued that the form of oath and rules that had heretofore been adopted by the State Party (see opinion in Brown v. Baskin, supra 78 F.Supp. at pages 936, 937) were fully justified and not forbidden by any rule of law. The argument is in great part based upon the private club theory, namely that the State Democratic Party not being now covered by any statutes of the State of South Carolina, was and is a private organization that could make its own rules and by-laws; and that this Court did not have the power or authority to rule as to who should be admitted whether on racial or other grounds. But the private club theory has been completely outlawed and demolished by the decisions resulting from a case brought a little over a year ago in this court, see Elmore v. Rice, D.C., 72 F. Supp. 516; Rice v. Elmore, 4 Cir., 165 F.2d 387, certiorari denied 333 U.S. 875, 68 S. Ct. 905, and while the attorneys for the defendants state that they realize this Court is bound to and will follow those decisions,

they still maintain that they do not believe they were justified, and that the rules adopted by the convention of the Democratic State Party were not in conflict with the Constitution and Laws of the United States. I hold distinctly otherwise. And so no real attempt has been made to justify the rules as to qualifications for voting and enrolling, namely Rules No. 6 and No. 7, quoted in full in the opinion in the case above cited 78 F.Supp. at page 936.

But on behalf of the Committee it is still argued that there is justification of the oath required prospective enrollees upon the ground that the party authorities had a right to require a declaration of principles and to require an oath from prospective members pledging their allegiance to the principles of the Democratic Party of South Carolina in supporting the social, religious and educational separation of races and also in the principles of States Rights and that the enrollee is opposed to "the proposed Federal so-called FEPC law."

■ As discussed in my former opinion in this case considering the rules and proposed oath, it is crystal clear that there was and could be but one reason for the adoption of the same, namely the classification of voters according to their being white or Negro, resulting in having two different methods of qualifications for voting and further resulting in the complete denial to one group of membership in the party and no voice in its management or the election of its officials or even a representation in its precinct, county or state gatherings or conventions. To say that these rules conform or even pretend to conform to the law as laid down in the case of Elmore v. Rice is an absurdity. Under the rules adopted by the State Party a Negro could never become a member, could never attend any meeting, could never have any vote in the election of the officials in charge of the party affairs, could never have a vote or even a voice in the adoption of rules, platforms or any part whatsoever in the government of the party. In other words, he was granted the privilege of voting at a primary election under certain conditions and upon certain qualifications, not applicable to white voters or voters of any other race under rules, terms and conditions in the adoption of which he had no part. We cannot escape the inevitable conclusion that this in no way complied with and was in contravention of the law of the land as enunciated by our courts in prior decisions and distinctly laid down in the Elmore case.

■ The proposed oath cannot be said to have any purpose other than the exclusion of Negro voters. It is common knowledge that in the face of determined and stout opposition, particularly in a number of the states in the Southern section of this country and more especially in the State of South Carolina, the Negro has made some slow advances, step by step in gaining his civil rights. Much of this has been won by determined effort and legal battles. In 1944 as a result of the decision of the Supreme Court of the United States in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110, the then Governor of South Carolina called an extraordinary (and it was extraordinary) session of the General Assembly of South Carolina and repealed all laws relating to primaries.

The Governor stated quite frankly what the purpose of this was and made no bones of the fact that the intention was to keep the primary elections in South Carolina limited to whites and to discriminate against Negroes. See opinion in Elmore v. Rice, supra, 72 F.Supp. at page 520. This declaration made openly by Governor Johnston in 1944 is carried on in veiled language and covertly in the rules and the oath adopted by the Democratic Party in convention assembled in 1948. It is common knowledge of which this Court may take judicial cognizance that the proposed Federal FEPC is legislation proposed to prevent discrimination of employment according to race. Of course, every one knows that a Negro would not take a solemn oath that he is opposed to legislation that would remove discrimination against him. And there are even stronger reasons why he would not take an oath that he believes in and will support "the social, religious and educational separation of races." Mr. Baskin and his fellow members of the 1948 Convention adopted in evasive language the brutally frank statement of Governor Johnston in 1944. As heretofore announced in the cases referred to and in the prior opinion

filed in this cause, this Court is of the opinion and holds that the Democratic Primary election in South Carolina is the true realistic election at which presidential electors, United States Senators and Congressmen are chosen. And the Democratic Party as constituted cannot in the conduct of such elections make any racial or religious discrimination. And its patent and flagrant attempt to bar qualified Negroes from participating in full membership in the party and casting ballots in the primaries is illegal. And the party officials have no right to make any division or discrimination amongst the citizens of the State because they are white, black or of any other race or color.

The Fourteenth Amendment to the Constitution of the United States when adopted (and later implemented by the various statutes preserving and protecting civil rights) was primarily adopted for the protection of members of the Negro race who were then recently freed from slavery and who, having been thus emancipated, were granted the franchise. In re Slaughter-House Cases, 1873, 16 Wall. 36, 81, 21 L.Ed. 394; Strauder v. State of West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664. And relying upon and summarizing the decisions of those cases the Supreme Court of the United States has recently held that covenants relative to real estate ownership and use restricting the same according to race cannot be enforced, since they are contrary to the equal protection of the laws guaranteed by the Fourteenth Amendment. See Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836. Speaking for the Court, Chief Justice Vinson at page 23 of 334 U. S., at page 847 of 68 S.Ct. says: "The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color. Seventy-five years ago this Court announced that the provisions of the Amendment are to be construed with this fundamental purpose in mind. Upon full consideration, we have concluded that in these cases the States have acted to deny petitioners the equal protection of the laws guaranteed by the Fourteenth Amendment."

And the late Chief Justice Stone in Hirabayashi v. United States, 320 U.S. 81, at page 100, 63 S.Ct. 1375, at page 1385, 87 L.Ed. 1774 says: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection."·

And in the same case in a concurring opinion Mr. Justice Murphy writes at page 110 of 320 U.S., at page 1390 of 63 S.Ct.: "Distinctions based on color and ancestry are utterly inconsistent with our traditions and ideals. They are at variance with the principles for which we are now waging war. We cannot close our eyes to the fact that for centuries the Old World has been torn by racial and religious conflicts and has suffered the worst kind of anguish because of inequality of treatment for different groups. There was one law for one and a different law for another."

I find that the plaintiff has acted promptly and properly in bringing this cause and is not to be considered negligent or guilty of laches. The case had to be brought because of the acts of the defendants in adopting and attempting to maintain illegal rules and regulations trying to deprive the plaintiff and others in like plight of their rights as citizens. And the claim that the plaintiff is not entitled to become a member of the Democratic Party because of his futile and fruitless attempts to be admitted into the company of citizens in this State is without foundation or authority. It is quite apparent that the defendants and those working with them deliberately set out to continue a form of racial discrimination in the conduct of primary elections in this State. This is illegal and must be stopped. Since they were fully advised as to the law of the land after the decisions of the Elmore case and its affirmance by the Appel-

late Courts, it is apparent that they will abide by, obey and enforce the law, only if and when they are required to do so by some judicial or other authority. It is further apparent that it is absolutely necessary that an Order of Injunction be issued carrying out the views and opinions as expressed in the Opinion and Order heretofore filed on the matter of a temporary injunction and the opinions herein expressed. Appropriate Findings of Fact, Conclusions of Law and an Order of Injunction will issue.